UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
HAGGAR INTERNATIONAL CORPORATION,
*doing business as* MONTANA FOOD INDUSTRIES,

                                                                          **MEMORANDUM**
                    Plaintiff,                                             **AND      ORDER**

                - against -                                                03 CV 5789 (CLP)

UNITED COMPANY FOR FOOD INDUSTRY
CORPORATION, et al.,

                    Defendants.
-------------------------------------------------------------------X

On November 17, 2003, plaintiff Haggar International Corporation, d/b/a Montana Food

Industries ("Haggar"), commenced this action, pursuant to 15 U.S.C. § 1115(b), against United

Company for Food Industry Corporation ("United") and Trans Mid-East Shipping & Trading

Agency, Inc. ("Trans Mid-East") (collectively, the "defendants").[1] Plaintiff's Second Amended

Complaint, filed April 27, 2004, contains eleven causes of action alleging, inter alia, that

defendants violated various provisions of the Lanham Act and New York State law through the

use of plaintiff's registered trademark "MONTANA,"[2] and that defendants sought to disrupt

plaintiff's use of the trademark. Specifically, plaintiff alleges claims for federal trademark

---

[1] In plaintiff's First Amended Complaint, filed on January 7, 2004, plaintiff named
United Company for Food Industry (USA) Corporation ("United USA") as an additional
defendant in this action. Although United USA has continued to nominally participate in the
case through the defendants' joint counsel, the parties report in their Proposed Joint Pretrial
Order ("PJPO"), filed May 5, 2011 and endorsed by the undersigned on that same date, that
United USA "is now a defunct company." (PJPO at 17).

[2] The parties used the word "Montana" both in their company names and in their marks.
So as to reduce confusion, the Court will use the capitalized version of the word ("MONTANA")
when it refers to the mark, and the lowercase version of the word ("Montana") when it is
referring to one of the parties.

infringement and use of a counterfeit mark, in violation of 15 U.S.C. § 1114(1), unfair competition, pursuant to 15 U.S.C. § 1125(a), cancellation of federal trademark registration under 15 U.S.C. § 1064, and additional trademark infringement claims under New York State law. (Compl.[3] ¶¶ 98-188). The Complaint also alleges that defendants sought to cause damage to plaintiff's good will by, inter alia, seeking to cancel plaintiff's mark, registering the mark in defendants' name, marketing competing foods bearing the MONTANA mark, disparaging plaintiff's products, and attempting to cause the Bureau of Customs and Border Protection ("Customs") to deny entry of plaintiff's products into the United States. (Id.)

Subsequently, United and Trans Mid-East filed answers to the Complaint, and then later filed counterclaims against Haggar for trademark infringement, trademark cancellation, unfair competition, trademark dilution, and various other claims under New York State law. (Ans.[4] ¶¶ 12-92). Defendants claim that they are the rightful owners of the both the MONTANA word and design marks (collectively, the "MONTANA marks"). (Ans. ¶ 9).

On December 19, 2006, Haggar filed the first motion for summary judgment, seeking to dismiss defendants' counterclaims on the grounds of laches and acquiescence, arguing that defendant United had waited too long to assert its claims of trademark ownership. Upon referral, this Court issued a Report and Recommendation, dated March 11, 2008, recommending that plaintiff's motion for summary judgment be denied because there existed sufficient questions of

---

[3]Citations to "Compl." refer to plaintiff's Second Amended Complaint, filed April 27, 2004.

[4]Citations to "Ans." refer to defendant United's Answer to Second Amended Complaint and Second Amended Counterclaims, filed May 26, 2004. The Court notes that each defendant filed a separate Answer, each containing counterclaims. However, United's Answer contains all the same counterclaims alleged by the other defendants, as well as several counterclaims not included in the other defendants' answers.

material fact as to whether Haggar's procurement of the MONTANA trademark was fraudulent, since a party asserting the equitable defenses of laches and acquiescence must do so with "clean hands." On June 4, 2008, the district court adopted the Report and Recommendation.

On April 1, 2009, defendants filed a second motion for summary judgment, seeking to preclude plaintiff from asserting any equitable defenses such as laches or acquiescence. This Court issued a Report and Recommendation, dated September 22, 2010, recommending that defendants' motion be denied, again because genuine issues of material fact remained on the question of whether Haggar committed fraud in its application to the United States Patent and Trademark Office ("USPTO") filed in 1989. In an opinion and order dated January 5, 2011, the district court adopted the Report and Recommendation.

On February 4, 2011, the parties consented to have the case assigned to the undersigned for all purposes, including entry of judgment, and waived their right to a jury trial, consenting to allow this Court to decide the issues. The case proceeded to trial, which was held before this Court from May 16 through May 18, 2011. The Court notes that several of the key witnesses had passed away prior to trial. Thus, at trial, Haggar's case-in-chief consisted of the live testimony of Ms. Hala Boulos ("Ms. Boulos"), as well as portions of the deposition transcripts of Sherif Boulos[5] ("Boulos" or "Sherif") and Alfi al Masri[6] ("al Masri"). Defendants' case-in-

---

[5]Mr. Boulos passed away on or about October 1, 2006. (Plaintiff Haggar International Corporation's Statement of Material Facts in Support of its Motion for Summary Judgment, Pursuant to Local Civil Rule 56.1, filed December 19, 2006 ("Pl.'s 2006 56.1 Stmnt") ¶ 48).

[6]Plaintiff uses the spelling "Alfi al Masri," while defendants use the spelling "Alfi El-Masri." The Court will simply use the former for the sake of consistency. Mr. al Masri, Mr. Boulos' father-in-law and business partner, also passed away prior to trial. Although the parties were able to depose Mr. al Masri prior to his death and enter his deposition transcript into evidence as Defendants' Exhibits HD-HF, plaintiff argues that al Masri's deposition makes it clear that his recollection was impaired by age and medical disability. (Plaintiff Haggar

chief consisted of the live testimony of Mamdouh Maamoun[7] ("Maamoun" or "Mamdouh") and

Alex Joudeh ("Joudeh"), as well as portions of the deposition transcripts of Sief Bisada

("Bisada") and Lawrence Cohen, Esq. ("Cohen").

For the reasons stated below, the Court finds in favor of plaintiff and Orders the

cancellation of United's MONTANA work mark, Trademark Registration No. 2,724,085, and an

accounting of monetary damages owed to Haggar by defendants.[8] To the Court's knowledge,

United's design trademark registration is merely pending (Ans. ¶ 9); accordingly, the Court does

not address cancellation of United's design trademark at this time.

---

International Corporation's Post-Trial Brief, filed July 20, 2011 ("Pl.'s Brief") at 20). In response, defendants protest that al Masri was deposed in May 2006, and at no time during the deposition did plaintiff or plaintiff's counsel raise any issue of impairment. Although a review of al Masri's deposition transcript suggests that at times he may have been confused by a question which was posed in English and then translated, this confusion appears to be the result of language issues. Since defendants were never on notice or given an opportunity to inquire as to al Masri's competence, (Defendants' and Counterclaim Plaintiffs' Summation Brief, filed August 22, 2011 ("Defs.' Brief") at 2-3), the Court, in evaluating al Masri's testimony, finds no basis to disregard his testimony based on this newly raised claim of impairment.

[7]One of the key witnesses for United, Magdi Maamoun, who was a principal of United during much of the critical period, also passed away prior to trial. Unfortunately, he was never deposed.

[8]In the Joint Pretrial Order filed on May 5, 2011, the parties disagreed on the status of the state law claims. Defendants raise a variety of federal and state counterclaims, which plaintiff contends are "merely duplicative" of "the claims which raise the. . .central issues in this case" – namely, whether Haggar committed fraud in its second trademark application to the USPTO, and, if not, whether United's counterclaims are nevertheless barred by the equitable doctrines of laches and acquiescence. (PJPO at 15-16). Plaintiff asks the Court "to defer consideration of all state law claims. . .in the interest of judicial economy, in the belief that resolution of the underlying federal trademark claims will resolve all the issues between the parties." (Id. at 7). Defendants claim that plaintiff waived its state law claims by not including them in the Joint Pretrial Order. (Id. at 8). However, if "this Court finds that Plaintiff is entitled to raise its State Claims at a later time, Defendants reserve their right to raise defenses to such Claims at that time." (Id. at 10). Given that neither party has had a full opportunity to brief the issues raised by the state law claims, the Court has not addressed them at this time.

I. Facts Not in Dispute

Although the parties disagree on certain critical facts relating to the development and use

of the MONTANA marks and the relationships between the parties, some facts are not in

dispute, and the Court has referred to these undisputed facts to provide a chronological

framework in which the trial testimony may be analyzed.

United is an Egyptian corporation engaged in the business of freezing, packaging, and

distributing Egyptian fruits and vegetables. (Compl. ¶¶ 16, 32; Defs.' 2007 56.1 Stmnt[9] ¶ 2).[10]

At some point in the 1980s, Sherif Boulos began distributing United's frozen food products in

the United States; these products were imported through Boulos' father-in-law, Alfi al Masri.

(Defs.' 2009 56.1 Stmnt[11] ¶ 13; Pl.'s 2009 56.1 Stmnt[12] ¶ 13). In 1986, Boulos incorporated

Haggar International Corporation in California and began distributing United frozen foods in the

United States, using the MONTANA mark. (Defs.' 2009 56.1 Stmnt ¶¶ 16-18). The parties

disagree about who was responsible for creating and designing the marks and about the nature of

---

[9]Citations to "Defs.' 2007 56.1 Stmnt" refer to Defendants' Statement of Additional Material Facts, Pursuant to Local Rule 56.1, filed February 5, 2007.

[10]The Court notes that in issuing an opinion after a bench trial, the Court may rely upon statements of fact previously submitted by the parties in conjunction with their prior motions for summary judgment. See, e.g., Merrill Lynch Capital Servs., Inc. v. UISA Finance, No. 09 CV 2324, 2012 WL 1202034, at *1, n.1 (S.D.N.Y. April 10, 2012).

[11]Citations to "Defs.' 2009 56.1 Stmnt" refer to Defendants' Summary of Material Facts, in Support of Their Motion for Summary Judgment on Fraud of Plaintiff Haggar, Pursuant to Local Rule 56.1, dated April 1, 2009.

[12]Citations to "Pl.'s 2009 56.1 Stmnt" refer to Plaintiff Haggar International Corporation's Responses and Objections to Defendants' Local Civil Rule 56.1 Statement of Material Facts, dated June 17, 2009.

the arrangement between Boulos and United regarding the distribution of United's food products in the United States.

It is undisputed that on December 30, 1987, Haggar filed a trademark application with the USPTO, seeking to register the word mark "MONTANA." (Defs.' 2007 56.1 Stmnt ¶¶ 10; Pl.'s 2009 56.1 Stmnt ¶ 22). The application, which was signed by Boulos, included a declaration as to ownership. (Defs.' 2009 56.1 Stmnt ¶ 23; Pl.'s 2009 56.1 Stmnt ¶ 23). It is also undisputed that Haggar presented several packaging bags ("specimen bags") to the USPTO in connection with the application; these bags were marked "Product of Egypt by the United Food Company for Food Industry." (Defs.' 2009 56.1 Stmnt ¶¶ 23-25; Pl.'s 2009 56.1 Stmnt ¶¶ 23-25). When Haggar failed to respond to requests from the USPTO for additional documentation to prove ownership of the MONTANA mark, the USPTO deemed the application abandoned as of November 4, 1988. (Defs.' 2009 56.1 Stmnt ¶¶ 25-27; Pl.'s 2009 56.1 Stmnt ¶¶ 25-27).

In 1988, following the submission of the 1987 application, Alan Mund, Esq. ("Mund"), Haggar's then attorney,[13] sent a letter to United seeking to have United assign its rights to the MONTANA mark to Haggar. (Defs.' 2009 56.1 Stmnt ¶ 28; Pl.'s 2009 56.1 Stmnt ¶ 28). What happened to that letter is a source of dispute between the parties. However, it is undisputed that in 1989, the relationship between United and Haggar ended, and United began using Nile Imports, Inc. ("Nile" or "Nile Foods") to distribute its products. (Defs.' 2009 56.1 Stmnt ¶¶ 32-33, 41; Pl.'s 2009 56.1 Stmnt ¶¶ 32-33, 41).

Sometime thereafter in 1989, Haggar filed a second trademark application. This

---

[13]Mr. Mund passed away prior to the beginning of the discovery phase of this case and was not deposed.

application was approved by the USPTO, and on March 6, 1990, the USPTO issued Trademark

Registration 1,585,940 to Haggar for the word trademark "MONTANA." (Pl.'s 2006 56.1 Stmnt

¶¶ 1-2; Defs.' 2007 56.1 Stmnt ¶ 13). On April 3, 1990, the USPTO issued a design trademark,

bearing Trademark Registration No. 1,590,078, to Haggar for its logo. (Pl.'s 2006 56.1 Stmnt ¶

5; Defs.' 2007 56.1 Stmnt ¶ 13). On October 25, 1989, United filed its own application to

register the MONTANA mark and its logo, only to abandon the application on February 20,

1991. (Pl.'s 2006 56.1 Stmnt ¶¶ 10, 17).

In 1991, Haggar registered its word and design trademarks with the United States

Customs Service ("Customs"), stating that there were no foreign business entities authorized or

licensed to use these trademarks abroad. (Defs.' 2009 56.1 Stmnt ¶¶ 43-44; Pl.'s 2009 56.1

Stmnt ¶¶ 43-44). Thereafter, in the summer of 1995, based on Haggar's claimed ownership of

the MONTANA mark, Customs seized a container of United products bearing the MONTANA

mark that had been imported by Nile. (Defs.' 2009 56.1 Stmnt ¶ 46; Pl.'s 2009 56.1 Stmnt ¶ 46).

On March 25, 2002, United filed a Petition to Cancel (the "Petition") Haggar's rights in

the MONTANA marks. (Pl.'s 2006 56.1 Stmnt ¶¶ 10, 46; Defs.' 2007 Resp.[14] ¶¶ 44, 46). When

Haggar failed to respond to the Petition, the USPTO entered a default judgment on September

13, 2002, cancelling Haggar's registration. United then filed its own application to register the

word mark in September 2002. (Pl.'s 2006 56.1 Stmnt ¶ 60, Ex. 16; Defs.' 2007 Resp. ¶ 60;

Pl.'s Ex.[15] 67). On June 10, 2003, the USPTO issued Trademark Registration No. 2,724,085 to

---

[14]Citations to "Defs.' 2007 Resp." refer to Defendants' Response to Plaintiff's Statement of Material Facts, Pursuant to Local Rule 56.1, filed on February 5, 2007.

[15]Citations to "Pl.'s Ex." refer to plaintiff's trial exhibits.

United for the word trademark "MONTANA." (Defs.' Ex.[16] FA). When Haggar moved to set aside the default judgment, claiming not to have received notice of the Petition, the default was set aside and Haggar's registration was restored on or before March 18, 2004.[17] (Pl.'s 2006 56.1 Stmnt ¶ 42; Defs.' 2007 Resp. ¶ 42). The parties have now cross-sued each other for ownership of the MONTANA marks and damages for infringement.[18]

## II. Legal Standards

### A. The Lanham Act - Trademark Infringement

Section 43(a) of the Lanham Act, 15 U.S.C. § 1115, prohibits a person from using "any word, term, name, symbol, or device, or any combination thereof," 15 U.S.C. § 1125(a), that is used "in commerce. . .in the ordinary course of trade," 15 U.S.C. § 1127, and "which. . . is likely to cause confusion. . .as to the origin, sponsorship, or approval of his or her goods. . . ." 15 U.S.C. § 1125(a)(1). See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114-16 (2d Cir. 2006). In explaining the objectives of the Lanham Act, the Supreme Court noted that the Act "'does not exist to reward manufacturers for their innovation in creating a particular device;' . . .but rather, by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure

---

[16]Citations to "Defs.' Ex." refer to defendants' trial exhibits.

[17] It is unclear why the restoration of Haggar's registration of the MONTANA mark did not automatically result in the cancellation of United's registration of the identical mark, but both registrations are currently active.

[18] The parties elected to bifurcate the trial on the issues of ownership and damages. (PJPO at 18). Thus, at this time, the Court only considers facts and arguments related to liability.

a producer that it. . .will reap the financial, reputation-related rewards associated with a desirable product.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29, 34 (2003) (quoting Tratflix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 34 (2001), and Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 163-64 (1995)).

In order to sustain a cause of action for trademark infringement, the plaintiff must establish two elements: (1) that "the mark or dress is distinctive as to the source of the good or service at issue," and (2) "that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant."[19] ITC Limited v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir. 2007) (citing cases); see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115 (reciting the two-prong test described in Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993)). However, before the Court analyzes if plaintiff has met both prongs of this test, "plaintiff must [first] demonstrate its own right to use the mark or dress in question." ITC Limited v. Punchgini, Inc., 482 F.3d at 154 (citing cases). Plaintiff must show priority of right over defendants in order to be entitled to relief.[20] See P. Daussa Corp. v. Sutton Cosmetics

---

[19]Under the second prong of the Gruner test, the Court must determine whether there is a "likelihood of confusion." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115. "Likelihood of confusion is the keystone of trademark infringement." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 430 (S.D.N.Y. 2004), aff'd in part, vacated in part, and remanded, 454 F.3d 108 (2d Cir. 2004). In Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961), the Second Circuit set out a non-exclusive, multi-factor test that considers, among other things: "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 116. Here, there is no dispute that the word mark "MONTANA," used by both parties, is identical. Since the parties have not specifically addressed the question of whether there is a likelihood of confusion between their logos, the Court declines to rule on this issue.

[20]To this end, the Lanham Act permits "[t]he owner of a trademark used in commerce [to] request registration of its trademark." 15 U.S.C. § 1051. However, registration is not a

(P.R.) Inc., 462 F.2d 134, 136 (2d Cir. 1972).

## B. Ownership and Incontestible Marks

The Lanham Act provides that: "The owner of a trademark used in commerce may apply to register his or her trademark under this chapter on the principal register hereby established. . . ." 15 U.S.C. § 105(a)(1).  Nevertheless, trademark ownership rights go to the "first-to-use, not [the] first-to-register." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:18 (4th ed. 2010).  Such rights "develop when goods bearing the mark are placed in the market and [are] followed by continuous commercial utilization." Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir.), cert. denied, Impressa Perosa, S.R.L. v. Buti, 535 U.S. 826 (1998) (internal quotations omitted).

Despite the general rule that trademark ownership rights go to the "first-to-use, not [the] first-to-register," 2 McCarthy, supra, § 16:18, when a trademark is registered on the USPTO's principal register (the "register"), the Lanham Act provides that the registration "shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce . . . ." 15 U.S.C. § 1115(a).  A mark gains "incontestable" status after it "has been in continuous use for five consecutive years subsequent to the date of registration and is still in use in commerce. . . ." 15 U.S.C. § 1065 (including other conditions not at issue here).  Incontestable trademarks are "conclusive"

_____

necessity because the Lanham Act also protects unregistered trademarks. See EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc., 228 F.3d 56, 61 (2d Cir. 2000).  Claims for trademark infringement of rights in both registered marks, brought pursuant to 15 U.S.C. § 1114(1), and marks acquired solely by use, brought pursuant to 15 U.S.C. § 1125(a), are analyzed under the same Gruner test.  See Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003).

evidence of the owner's exclusive right to use the mark. 15 U.S.C. § 1115(b); see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117 (2004).

## C. Defenses to Charges of Infringement

The Lanham Act provides a number of defenses to charges of infringement of an incontestable trademark, including: "(1) that the registration or the incontestable right to use the mark was obtained fraudulently; . . .(5)" that the alleged infringers were rightful continuous prior users of the mark, or ". . .(9) that equitable principles, including laches, estoppel, and acquiescence, are applicable."[21] 15 U.S.C. § 1115(b). See Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt., 718 F. Supp. 2d 292 (E.D.N.Y. 2010). "If one of the defenses is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark." Park 'N' Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 199 n.6 (1985). "[E]ven an incontestable registrant" may be denied the benefit of its mark "where that party's use of the mark is tainted with inequitableness or bad faith." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945); Getty Petroleum Corp. v. Shore Line Oil Co., 642 F. Supp. 203, 205-06 (E.D.N.Y. 1986). If the court ultimately finds that the registrant is not entitled to ownership of the mark, the court is empowered to order cancellation of the registration. 15 U.S.C. § 1119; see also 15 U.S.C. § 1064 (permitting a party to file a petition to cancel a trademark application where the "registration was obtained fraudulently. . .or contrary to the provisions. . .for a registration under this Act").

---

[21]These equitable principles may be raised as defenses to any claim of trademark infringement, not only claims based on marks that have reached incontestable status.

DISCUSSION

This Court must decide which party owns the MONTANA marks in the United States and thus holds the right to use them on packages of frozen vegetables sold in this country. It is undisputed that the marks have reached incontestible status by virtue of Haggar's 1989 USPTO registration. Since incontestible trademarks are "conclusive" evidence of the owner's exclusive right to use the mark absent a valid defense, defendants, in order to defend themselves against Haggar's claim of infringement, must successfully invoke at least one of the defenses provided for in the Lanham Act. See 15 U.S.C. § 1115(b). Accordingly, defendants claim that Haggar obtained its incontestible status fraudulently and that United was a rightful continuous prior user of the mark. If the Court finds that either of defendants' defenses are valid, then the Court must proceed to analyze defendants' counterclaims against Haggar and Haggar's equitable defenses of laches and acquiescence against such counterclaims.

The Court first turns to defendants' claim that Haggar obtained its rights to the marks fraudulently.

## I. United's Defenses to Haggar's Claims

### A. Fraud

Although it is undisputed that Haggar registered the MONTANA marks with the USPTO in 1989, United contends that the registrations were fraudulently obtained and that the word and design trademarks should be cancelled.

Fraud in obtaining a trademark registration occurs when an applicant knowingly makes a false, material misrepresentation of fact in connection with its application. See Maids to Order of Ohio, Inc. v. Maid-To-Order, Inc., 78 U.S.P.Q.2d 1899, 1905 (T.T.A.B. 2006); see also

12

Tuccillo v. Geisha NYC, LLC, 635 F. Supp. 2d 227, 241 (E.D.N.Y. 2009) (stating that "[t]o prevail on a cause of action for trademark cancellation on grounds of fraud on the [USPTO], it is necessary for the petitioner to demonstrate that the statements (1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application"). Since direct evidence of deceptive intent is rarely available, subjective intent to deceive can be inferred from indirect and circumstantial evidence. In re Bose Corp., 580 F.3d 1240, 1243-44 (Fed. Cir. 2009); see also Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008), cert. denied, 129 S. Ct. 1595 (2009).

However, a party alleged to have committed fraud may rely on good faith as a defense: "Fraud. . .will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true. . . ." Maids to Order of Ohio, Inc. v. Maid-To-Order, Inc., 78 U.S.P.Q.2d at 1905. The alleged fraudulent misstatements must be more than an "error or inadvertence," and instead must show a "deliberate attempt to mislead the [USPTO]." Orient Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988) (internal quotations omitted). Indeed, fraud on the USPTO "implies some intentional deceitful practice or act designed to obtain something." Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1905 (citing Cerveceria India Inc. v. Cerveceria Centroamericana, S.A., 10 U.S.P.Q.2d 1064, 1065 (T.T.A.B.), aff'd, 892 F.2d 1021 (Fed. Cir. 1989)).

A party moving to cancel a trademark based on fraud on the USPTO bears the burden to prove the fraud by "clear and convincing evidence." Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc., 842 F.2d at 653; Tuccillo v. Geisha, 635 F. Supp. 2d at 241. When the allegation of fraud centers on a trademark applicant's signed oath, the charging party bears an especially high burden:

> In determining whether an applicant, when he signed his application oath, held an honest, good faith belief that he was entitled to registration of his mark, the Board has stated that if the other person's rights in the mark, vis-a-vis the applicant's rights, are not known by applicant to be superior or clearly established, e.g., by court decree or prior agreement of the parties, then the applicant has a reasonable basis for believing that no one else has the right to use the mark in commerce, and that applicant's averment of that reasonable belief in its application declaration or oath is not fraudulent.

Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1908. The party alleging fraud carries a "heavy burden of proof," and, in deciding whether fraud has been committed, the Court has "no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." In re Bose Corp., 580 F.3d at 1243. Indeed, "the statement of an applicant that no other person to the best of his knowledge has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are using the mark if he feels that the rights of such others are not superior to his. Thus, an applicant who has at least 'color of title' to the mark is not guilty of fraud. . . ." Yocum v. Covington, 216 U.S.P.Q. 210, 216-17 (T.T.A.B. 1982).

In short, for United to prevail in its challenge to Haggar's registration on the basis of fraud, United must prove that Haggar deliberately and deceitfully made false statements in its 1989 application to the USPTO that were material to the determination to grant the application. Defendants must prove this claim by "clear and convincing evidence." Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc., 842 F.2d at 653; Tuccillo v. Geisha, 635 F. Supp. 2d at 241; Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1905.

In its motion for summary judgment, United argued that Haggar had committed fraud in its August 2, 1989 application through false assertions in three aspects of the trademark

14

application: 1) Haggar's assertion of ownership of the marks; 2) a false claimed date of first use; and 3) the presentation of specimen bags that did not bear United's name as manufacturer. The Court addresses each fraud claim in turn.

### 1. Haggar's Asserted Ownership of the Mark

Sherif Boulos, in presenting the second trademark application to the USPTO in 1989, signed the oath required by statute stating that "to the best of his knowledge," no one else had the right to use the marks in commerce. Specifically, the oath provided that the signer

> believes said corporation to be the owner of the trademark sought
> to be registered; to the best of his/her knowledge and belief no
> other person. . .has the right to use said mark in commerce, either
> in the identical form or in such near resemblance thereto as may be
> likely to. . .cause confusion, or to cause mistake, or to deceive. . . .

(Defs.' 2009 56.1 Stmnt ¶ 23; Pl.'s 2009 56.1 Stmnt ¶ 23). In their summation brief, defendants argue that the "[e]vidence shows that S. Boulos knew that [his] statements [in the application oath] were false" at the time he swore to them because he knew that United was the foreign manufacturer and first user of the marks, while Haggar was merely United's exclusive distributor in the United States and "did not secure any rights to the trademark MONTANA from sales in the United States of United's MONTANA products." (Defs.' Brief at 6-7).

For United to show that Haggar committed fraud by asserting ownership of the MONTANA marks in its 1989 application to the USPTO, United must prove, by clear and convincing evidence, that Haggar deliberately and deceitfully misrepresented itself to be the owner of the marks. Thus, if Haggar had "at least 'color of title' to the mark," Yocum v. Covington, 216 U.S.P.Q. at 216-17, it did not commit fraud by asserting ownership.

Generally, trademark ownership rights attach to the first to use the mark in commerce. Blue Planet Software, Inc. v. Games Int'l, LLC, 334 F. Supp. 2d 425, 436-37 (S.D.N.Y. 2004).

15

However, to enforce such ownership rights in this country's courts, that use in commerce must be in the United States. Commercial "use of a mark overseas cannot form the basis for a holding of priority trademark use" in the United States. De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, 440 F. Supp. 2d 249, 269 (S.D.N.Y. 2006). Indeed, "[p]rior use of a trademark in a foreign country does not entitle its owner to claim exclusive trademark rights in the United States as against one who used a similar trademark in the U.S. prior to entry of the foreigner into the domestic American market." 2 McCarthy, supra, § 29.01[3] (citing Bulk Mfg. Co. v. Schoenbach Products Co., 208 U.S.P.Q. 664, 667 (S.D.N.Y. 1980) (holding that plaintiff's copying of mark and design from English firm did not constitute "unclean hands" in litigation against another company claiming rights to a similar mark)); Johnson & Johnson v. Diaz, 339 F. Supp. 60, 63 (C.D. Cal. 1971).

This rule applies with equal force to protect a company that outright copies a mark that has been previously used abroad but that is not famous in the United States, uses the copied mark on goods sold in the United States, and then claims to have priority in the mark in the United States over the foreign originator. 2 McCarthy, supra, § 29.01[3] (citing Person's Co., Ltd. v. Christman, 900 F.2d 1565 (Fed. Cir. 1990)). As Professor McCarthy explains in his treatise on trademark law:

> The Federal Circuit held [in Person's Co., Ltd. v. Christman] that there is no illegality in an American visitor to Japan seeing the word PERSON'S used as a mark on wearing apparel, returning to the U.S. and commencing use of PERSON'S as a mark on wearing apparel. At that time, the mark was used only in Japan and was not a "famous" mark "well known" by reputation in the United States. The court said that the American committed no fraud in applying to register the mark in the U.S. The American had domestic priority over the Japanese company, which later commenced sales in the U.S. The American succeeded in cancelling the U.S. registration granted the Japanese company.

16

> [. . .] Thus, in the U.S., the American is the senior user and the
> Japanese company is the junior user, even though the Japanese
> company was the world-wide senior user.

Id. The original foreign user of the mark only retains priority in the United States over the

copier if the copied mark "is so famous that its reputation is [already] known in the United

States" prior to the efforts of the United States user and copier. Id. (citing All England Lawn

Tennis Club, Ltd. v. Creations Aromatiques, Inc., 220 U.S.P.Q. 1069 (T.T.A.B. 1983) (enjoining

an American from registering "Wimbledon Cologne," which displayed a picture of a tennis

player on the bottle); Vaudauble v. Montmartre, Inc., 20 Misc. 2d 757, 193 N.Y.S.2d 332, 123

U.S.P.Q. 357 (N.Y. Sup. Ct. 1959) (enjoining an American from opening a New York restaurant

called "Maxim's," named after the famous Paris restaurant of the same name)).

In this case, there is no dispute that prior to the time United first started doing business

with al Masri and Haggar, "at the end of [19]85 or beginning of [19]86" (Tr.[22] at 434), until the

relationship ended in 1989, no other company was importing or selling United's frozen

vegetables in the United States. (Id. at 327, 331, 339, 434; Defs.' Ex. HF at 20-21; Defs.' 2009

56.1 Stmnt ¶¶ 14, 15; Pl.'s 2009 56.1 Stmnt ¶¶ 14, 15). While the parties dispute who initially

conceived of and designed the marks, there is no evidence to suggest that United used the

MONTANA brand to sell frozen food products in the United States prior to its involvement with

al Masri, Boulos, and Haggar in 1985-86. (Defs.' 2009 56.1 Stmnt ¶¶ 9, 11-17; Pl.'s 2009 56.1

Stmnt ¶¶ 9, 11-17). Indeed, the testimony demonstrated that United did not begin production of

frozen vegetables until the latter part of 1984 (Defs.' Ex. HH at 15, 16, 25, 38, 53), and,

according to United's witnesses, did not even adopt the MONTANA mark until sometime in

---

[22]Citations to "Tr. at" refer to pages in the trial transcript of proceedings before this Court
running from May 16 through May 18, 2011.

1985. (Tr. at 236-38). Thus, the Court finds that Boulos was the first to use the MONTANA brand in the United States on frozen vegetables.

Similarly, there was no evidence presented that the MONTANA brand was already so "famous" in the United States before Boulos/Haggar's entry into the United States market that United should be regarded as having established a foothold in the market for its products and consumer recognition of its brand before ever selling its goods here. The only testimony presented on this point was that of Iskandar Joudeh ("Joudeh"), the chief executive of defendant Trans Mid-East Shipping and Trading (Tr. at 452), who testified that since the time he "started this business, the frozen [vegetable] industry was synonymous [with MONTANA]. The only brand good name is MONTANA." (Id. at 473). However, Mr. Joudeh did not specify whether he was describing the United States or international market for Egyptian frozen vegetables, and since he did not begin importing United's products into the United States until 1991, his testimony about his U.S. customers' desires for United's frozen foods in 1991 to 2002 is irrelevant to the question of whether the MONTANA brand was famous in the United States prior to Haggar's use of the MONTANA marks in its sales. (See id. at 473-76).

By contrast, Hala Boulos testified that when she and Sherif first started selling United's frozen vegetables, it would take them 3 to 4 months to sell a container, and that they had to work particularly hard in order to sell the very first container they received, going door to door to local supermarkets and retailers for 4 months to convince them to carry the goods. (Id. at 534-35). Similarly, Alfi al Masri testified that prior to Mr. Boulos' efforts, United's name and brand was not well-known, let alone "famous," in the United States: "[Sherif] makes the distribution and he make a name. [. . .] Without Sherif, nobody can knows about United." (Defs.' Ex. HF at 38).

Since no other evidence addressing the fame of the mark in the United States was

18

presented, the Court finds that United has failed to prove by "clear and convincing" evidence that the MONTANA brand was already famous in the United States before plaintiff's efforts.[23]

However, the law is clear that where two companies operate within a manufacturer-distributor arrangement, the "exclusive U.S. distributor does not acquire ownership of a foreign manufacturer's mark any more than a wholesaler can acquire ownership of an American manufacturer's mark, merely through the sale and distribution of goods bearing the manufacturer's trademark." 2 McCarthy, supra, § 29.02. In such cases, the general principle is that "when disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights." Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011) (internal citations omitted), cert. denied, 462 F. App'x 31 (2d Cir. 2012); see also Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329, 336 (S.D.N.Y. 1999). "[I]n the absence of an agreement between the parties, the manufacturer is presumed to own the trademark." Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403. "A distributor, importer or other distributing agent of the goods of a manufacturer or producer does not acquire a right of ownership in the manufacturer's or producer's mark merely because it moves the goods in trade." Patent and Trademark Office, Trademark Manual of Examining Procedure, § 1201.06(a) (5th ed. 2007). Indeed, the USPTO's Trademark Manual of Examining Procedure ("TMEP") provides that:

> A distributor or importer. . .can register the mark only. . . [i]f an applicant is the U.S. importer or distribution agent for a foreign manufacturer's mark in the U.S., provided the applicant submits

---

[23]Given that United only developed the MONTANA mark in 1984 (Tr. at 274), and did not begin to market its vegetables outside of Egypt until the same year (see id. at 259-61), it is not hard to understand why the mark may not have acquired fame and name recognition in the United States prior to Boulos' efforts.

> . . .(a) written consent from the owner of the mark to registration in
> the applicant's name, or (b) written agreement or acknowledgment
> between the parties that the importer or distributor is the owner of
> the mark in the United States, or (c) an assignment. . .to the
> applicant of the owner's rights in the mark as to the United States
> together with the business and good will appurtenant thereto.

Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d at 335 (citing TMEP §
1201.06(a)).

"Absent a clear manifestation of intent by a supplier [or manufacturer] to transfer
ownership of a trademark to a distributor, the supplier [or manufacturer] remains the rightful
owner" of a trademark registration. Software AG, Inc. v. Consist Software Solutions, Inc., No.
08 CV 389, 2008 WL 563449, at *17 (S.D.N.Y. Feb. 21, 2008), aff'd, 323 F. App'x 11 (2d Cir.
2009); Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 600 (S.D.N.Y.
2001); Ushodaya Enterprises, Ltd. v. V.R.S. Int'l, Inc., 63 F. Supp. 2d at 336.  This is true even
when two parties have an exclusive distributorship agreement; if that agreement comes to an
end, "any rights which [the distributor] may have had in the mark during the life of the agency
immediately revert[] to [the manufacturer]." Major-Prodotti Dentari-Societa in Nome Collettivo
Di Renaldo, 161 U.S.P.Q. 437, 438 (T.T.A.B. 1968) (finding that a domestic distributor's
registration was void ab initio because the written agreement between the parties made clear that
respondent had no proprietary rights in the mark at the time he filed the application which
matured into the subject registration); see also Omag Optik Und Mechanik A.G. v. Weinstein, 85
F. Supp. 631, 635 (S.D.N.Y. 1949) (stating that the distributor must demonstrate "a clear
intention on the part of the manufacturer to transfer the mark to the distributor" before the
distributor may lay claim to the benefits of the registration).

However, when "goods pass through the distributor's hands in the course of trade and the

distributor gives them the benefit of its reputation or of its name and business style, this presumption [of trademark ownership in the foreign manufacturer] may be rebutted." Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d at 600; see also Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403. Among the factors that courts commonly consider in determining this issue are:

> 1) which party invented and first affixed the mark onto the product; 2) which party's name appeared with the trademark; 3) which party maintained the quality and uniformity of the product; and 4) with which party the public identified the product and to whom purchasers made complaints.

Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403 (adopting the Sengoku and Tactica modifications to the Wrist-Rocket test[24]); see also Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1220 (9th Cir. 1996) (modifying the Wrist-Rocket analysis to include only the above four factors rather than the six factors in the original test), cert. denied, 521 U.S. 1103 (1997); Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d at 600 (adopting the Sengoku modifications to the Wrist-Rocket analysis). Other courts also consider "which party paid for advertising and promotion of the trademarked product," Autotech Tech. Ltd. P'ship v. Automationdirect.Com, Inc., No. 05 CV 5488, 2007 WL 2388794, at *3 (N.D. Ill. Aug. 17, 2007), "which party possesses the goodwill associated with the product, or which party the

---

[24]In Wrist-Rocket Mfg. Co. v. Saunders, the court considered (1) whether the distributor or the manufacturer invented the trademark, (2) which company first affixed the mark to the product, (3) whether there was an agreement between manufacturer and distributor concerning use of the trademark, (4) whether the manufacturer or distributor maintained the quality and uniformity of the product, (5) whether the public bought the product on the distributor's reputation or the manufacturer's, and (6) whether the public identified the origin of the product with the distributor or the manufacturer. 379 F. Supp. 902, 913-14 (D. Neb. 1974). Courts have since condensed and rephrased this six factor test into the form applied in Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403.

public believes stands behind the product." Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403 (internal citations and quotations omitted). Together, "these factors reflect the principle that 'actual use in connection with a particular business' is the primary consideration in establishing ownership of a trademark. Id. (quoting G's Bottoms Up Social Club v. F.P.M. Indus., 574 F. Supp. 1490, 1495 (S.D.N.Y. 1983); also citing Montgomery v. Kalak Water Co., Inc., 196 F. Supp. 173, 177 (S.D.N.Y. 1961)).

Defendants contend that Haggar was merely a distributor of United's products, and that, therefore, Boulos knew that United had the superior right to the marks; thus, his statement in the 1989 trademark application was knowingly false. Plaintiff, on the other hand, claims that during the time that Haggar sold United's goods in the United States, Haggar did business as al Masri's customer, and not as a distributor of United. It is undisputed that the business arrangment reached at the 1985 initial meeting between Boulos, al Masri, and Magdi Maamoun was not contemporaneously reduced to writing by the parties. (Defs.' Brief at 16 (citing Defs.' Ex. AT)). Thus, the nature of their business relationship is far from clear. Additionally, it appears that there was no oral or written agreement between the parties regarding Haggar's rights to use or register the MONTANA marks.[25] See Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403.

However, "the factors used in determining the question of ownership" of the

---

[25]Mr. Boulos testified that there was no discussion or agreement reached at the initial meeting in 1985 as to the use of the term "Montana." (Defs.' Ex. HB at 62; Defs.' Ex. HC at 155, 157). It is undisputed that Mund, Haggar's former attorney, sent a letter to United in 1988, following the submission of Haggar's 1987 trademark application to the USPTO, seeking the assignment of rights to the MONTANA word mark to Haggar. (Defs.' 2009 56.1 Stmnt ¶¶ 26, 28; Pl.'s 2009 56.1 Stmnt ¶¶ 26, 28). It is also undisputed that United did not respond to this letter and did not grant the assignment. (Defs.' 2009 56.1 Stmnt ¶ 28; Pl.'s 2009 56.1 Stmnt ¶ 28). Taking Haggar's testimony and exhibits together, plaintiff presented no evidence of a written agreement in which United transferred or assigned to Haggar the rights to the MONTANA brand.

MONTANTA mark "are the same whether or not [Haggar] is given the title of 'distributor.'"

Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d at 600. Indeed, "the resolution of who has the right to the mark in this case does not turn on whether the [plaintiff] was an exclusive distributor for [defendants]." Wrist-Rocket Mfg. Co. v. Saunders, 379 F. Supp. at 910. If the Court finds that United's "rights in the mark, vis-a-vis [Haggar's] rights, [were] known by [Boulos] to be superior or clearly established, e.g., by court decree or prior agreement of the parties," then it must find that the mark belonged to United and Boulos' application was fraudulent. However, if Boulos had "a reasonable basis for believing that no one else ha[d] the right to use the mark in commerce," then his oath was "not fraudulent." Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1908. Specifically, if Haggar gave United's products "the benefit of its reputation or of its name and business style," thereby overcoming the general presumption of ownership in a foreign manufacturer, it would have at least color of title and therefore not be guilty of fraud in its 1989 USPTO trademark application.

To determine the question of whether Haggar is responsible for giving the MONTANA brand "the benefit of its reputation or of its name and business style" in the United States, the Court applies the modified Wrist-Rocket factors to the time period from 1985, when United and Haggar began doing business together, to 1989, when Haggar filed its second trademark application and the companies ended their relationship.

a. Which Party Invented and First Affixed the Mark

Both Haggar and United claim to have invented the MONTANA marks and to have been the first to affix them to their packaging bags.[26]

---

[26]In determining which party was the first to affix the mark to its products, Section 45 of the Lanham Act provides that goods must be "used in commerce" in the United States in order to

23

Haggar asserts that prior to its use of the stand-alone word MONTANA as a trademark, United had been using "Moon-tana" and "Montana Egypt" as its marks, but never MONTANA by itself. (Defs.' Ex. HB at 91-92; Defs.' Ex. HC at 153, 174, 176-80, 186). Mr. Boulos testified that when he first met with Magdi Maamoun to discuss importing United's frozen vegetables to the United States, United was using the name "Moon-tana" on its packaging because "Maamoun. . .stands for Moon-tana." (Defs.'s Ex. HB at 52-53; Defs.' Ex. HC at 152, 155). However, Boulos did not recall ever seeing that name on signs in front of United's factory or on United's trucks (Defs.' Ex. HB at 53), and plaintiff submitted no documentary evidence bearing such a mark. Boulos also testified that he was unaware that United was using the MONTANA mark on its products in 1985 (Defs.' Ex. HC at 156-57), and he did not recall United ever using the term MONTANA during that first meeting. (Defs.' Ex. HB at 53-54).

---

be eligible for trademark protection. 15 U.S.C. § 1127. Generally, a mark is deemed to be "affixed" and in commercial use if it is:

> (1) Placed in any manner on the goods; (2) Placed in any manner on the containers for the goods; (3) Placed in any manner on the displays associated with the goods or containers; (4) Placed in any manner on the tags or labels affixed to the goods or containers; or (5) If the nature of the goods makes any of the above methods of placement impracticable, then on documents associated with the goods or their sale."

2 McCarthy, supra, § 16.10. Courts have held that use of a mark on a shipping label attached to a container is properly regarded as "affixed" to the product, In re Schering-Plough Corp., 211 U.S.P.Q. 69 (T.T.A.B. 1981), but that the same mark placed on the packing invoice insert is not. 2 McCarthy, supra, § 16.10[1] (citing In re Dura Corp., 188 U.S.P.Q. 701 (T.T.A.B. 1975)). "Advertising and documentary use of a symbol apart from the goods does not constitute a statutory 'trademark use' of that symbol." 2 McCarthy, supra, § 16.10[1] (citing Powermatics, Inc. v. Globe Roofing Co., 52 C.C.P.A. 950, 341 F.2d 127, 144 U.S.P.Q. 430 (1965). Here, given that the MONTANA brand cannot be placed directly on the frozen vegetables themselves, the key inquiry for the Court to determine is whether the goods were initially packaged in United's bags or Haggar's bags. The marks used on invoices and other correspondence are irrelevant as they do not constitute "affixed" uses. Id.

Boulos testified that he first conceived of using MONTANA as Haggar's trademark in 1985, and that he first used the term MONTANA when he submitted his fictitious name application in the United States. (Defs.' Ex. HB at 65-66). Boulos admitted that the word "Montana" does not have any significance in the Egyptian language (id. at 77), and that he was inspired to choose Montana Food Industry as the fictitious name for his company by "the company producing the Moon-tana products."[27] (Id. at 71). Indeed, when asked, "You are saying because United was using Moon-tana, you came close to it and used Montana?" he answered, "Correct." (Id. at 71-72).

Mr. Boulos also testified that he first had the Haggar packaging bags marked with "MONTANA" in 1985 or 1986, using his own designs. (Id. at 66-68). He identified Plaintiff's Exhibit 6, the word mark MONTANA, bearing the USPTO registration number of 1585940, and Plaintiff's Exhibit 7, the graphic mark of a cartoon boy, holding a basket of vegetables,[28] bearing the USPTO registration number of 1590078, as these designs. (Id.) Boulos stated that he created the designs but "a lady designer in Egypt" drew the graphics for him. (Id. at 73). According to Boulos, he asked her to draw "[a]nything that relates to food business," and based

---

[27]According to Mr. Boulos, some of the shipments sent to him "had a Moon-tana with a mountain and Egypt next to it, it used to be mixed," but he then clarified that he "really [didn't] remember" whether United was using Moon-tana or MONTANA as its mark. (Defs.' Ex. HC at 174). Even though he acknowledged that Defendants' Exhibit CA was a United label for frozen vine leaves, produced in 1988, that displayed MONTANA on the front and back parts of the label, and said "Product of Egypt by the United Company for Food Industry," Boulos nevertheless stated that he had "never seen" United use MONTANA "ever. It has always been M-double-O in 1985, 1986." (Id. at 176-77).

[28]The graphic mark of a cartoon boy portrays, in the foreground, a boy wearing a chef's hat and black clothing. The boy is holding a large basket filled with unidentified produce, and he is walking to the left of the page. The image of the boy is surrounded by a white star burst on a dark background. (See Pl.'s Ex. 7).

on those instructions she came up with Haggar's logo depicting the boy carrying a basket of vegetables. (Id. at 74-76; Pl.'s Ex. 7). He stated that he was not familiar with United's similar two cartoon chef logo (the "two chefs logo")[29] at the time, and did not hand the designer any pictures of United's logos to use as a guide. (Defs.' Ex. HB at 74-76).

However, Boulos admitted using United's two cartoon chef mark in another context. Examining the United frozen garden peas packaging bag label marked as Defendants' Exhibit CC, he acknowledged that the two cartoon chefs logo displayed on the label is a trademark of United. (Defs.' Ex. HC at 190). When subsequently presented with Defendants' Exhibit B, a letter signed by him bearing the letterhead of Montana Food Industries and including the same two cartoon chefs logo in the upper left hand corner, Boulos unapologetically stated that he "was just using" the two cartoon chefs logo because "that's not a trademark, that's a logo." (Id. at 191-92). Despite his mistaken assertion that the logo was not a trademark, Boulos admitted that the logo identified United's products, and that he sent this letter sometime in 1986 or 1987, during the time he was importing frozen food products from United. (Id. at 192).

According to Boulos, he had "poly bags" printed by an Egyptian company, Nile Company for Printing, based on Mr. Boulos' design. (Defs.' Ex. HB at 55-56; Defs.' Ex. HC at 158). Mr. Boulos claims that he, not United, supplied the bags for United to use in packaging its products for him to sell (Defs.' Ex. HB at 80); that he sent United "thousands of bags" at a time (id.); and that he never used United's MONTANA packaging. (Defs.' Ex. HC at 153-54). "I always sold MONTANA, not Moon-tana. [. . .] Without Egypt next to it. It was always just

---

[29]The two chefs logo is a cartoon image portraying a female chef wearing a checkered apron and a chef's hat standing in front of a male chef wearing a bow tie and a chef's hat. The female chef is facing to the right of the page and holding out a plate with one hand. The male chef appears to be closing his eyes and holding a fork in his mouth. (See Pl.'s Ex. 3).

MONTANA." (Id. at 153). However, he was unable to produce an example bag or bills reflecting printing done by Nile. (Defs.' Ex. HB at 81).

As for the labels on the bags, Boulos initially testified equivocally, stating that the first Haggar label bearing the MONTANA mark was produced in 1985 or 1986, but subsequently he stated explicitly that these labels were in production on September 1, 1985. (Id. at 70). However, plaintiff produced no documentary evidence corroborating the claim that Haggar had begun producing MONTANA labels by September 1, 1985.

United's claim to inventing the mark rests on the testimony of Seif Bisada ("Bisada"), Maamoun, and al Masri. At his deposition, taken on December 12, 2006, Bisada testified that from 1982 to 1988 or 1989, he worked as the general manager of a French company named Matal Egypt ("Matal"),[30] which specialized in "food industry and refrigeration." (Defs.' Ex. HH at 12-13). In 1982, Matal was retained to build a food processing plant for United, and Bisada was placed "in charge of the electrical part" (id. at 14), specifically the "[s]tart up of all refrigeration [in] the plant." (Id. at 14, 38, 50-52). A French engineer was "in charge of the mechanical part" (id. at 14), and he and Bisada worked in the same office. (Id. at 35). Once the plant was "in operation" (id. at 14), United began production of frozen vegetables during the second part of 1984, with Bisada "running the plant." (Id. at 15-16, 25, 38, 53). In that capacity, Bisada observed the production line, packing area, and packing machines. (Id. at 16).

According to Bisada, initially United packaged its frozen food products in bulk in plain polyethylene bags ("poly bags"). (Id. at 17, 40). However, at the end of 1984, United requested that the packing bags feature a logo, and United asked the French engineer in charge of the

---

[30]According to both Bisada and Maamoun, the original idea for United to use the MONTANA mark came from Matal. (Defs.' Ex. HH at 17-18, 24, 33-35, 40; Tr. at 235-36).

mechanical aspects of the plant to create a name and logo for the products. (Id.) The French engineer chose the brand name MONTANA; Bisada explained that the French engineer told him that he chose this name because "in Italy, there is some sort of mountains called Montana, it's high, and [the product is] frozen vegetables." (Id. at 17, 33). He asked Bisada for his opinion, and Bisada complimented the name choice. (Id. at 35). According to Bisada, the French engineer also designed the graphic logo for United that featured two cartoon chefs. (Id. at 18, 24).

Although Maamoun confirmed that someone at Matal "[s]uggested a name Montana because Montana represented mountains of ice, and because we deal with frozen food. . . ." (Tr. at 235-36), Maamoun credited an Egyptian governmental agency named Dar Alhilal with designing the accompanying logo, showing "the boy and girl, and the. . .ice mountain below them." (Id. at 236-37). Maamoun stated that United's board approved the name MONTANA and the logo in a 1985 meeting (id. at 236-38), and that neither Mr. Boulos, nor Ms. Boulos, nor Mr. al Masri participated in United's selection of the MONTANA mark. (Id. at 339).

Bisada confirmed that Sherif Boulos was not present when the MONTANA brand name was adopted by United. (Defs.' Ex. HH at 19-20). Bisada also confirmed that in 1984 and 1985, after United adopted the brand name MONTANA, United's frozen foods were shipped in bags printed with the MONTANA brand name and the two cartoon chefs logo. (Id. at 20, 41-42, 62). When shown Defendants' Exhibit DG – the bags provided by Haggar to the USPTO as specimen bags in its first trademark application – Bisada testified that these were the same type of MONTANA-branded bags used by United when it first began operations. (Id. at 22). Even though Haggar represented in its 1987 application that Defendants' Exhibit DG was an example of Haggar's own bags, Ms. Boulos admitted that Haggar submitted United's packaging bags as

28

the specimen bags in support of its ultimately abandoned 1987 trademark application. (Defs.' Ex. HA at 124-25). This admission concurred with the testimony of Bisada, who stated that during the period from 1984 to 1985, when he supervised United's food production plant, he never saw United use a bag other than the type represented by Defendants' Exhibit DG. (Id. at 62-63, 72).

Bisada explained that each bag had "United Company for Food Industry" written on the outside. (Defs.' Ex. HH at 24). When products were packed in clear bags and put into cartons, the carton would be marked MONTANA. (Id. at 47-48). Bisada, who observed the packaging area of the factory, testified that all of the goods produced at United's Egyptian factory were packed in bags or cartons marked MONTANA, and he knew of no other company in Egypt using MONTANA to identify its goods. (Id. at 27, 31).

Based on what he personally observed at the plant and in Egyptian supermarkets, Bisada testified that United used the MONTANA brand on products sold in Egypt during the period from 1984 to 1986. (Id. at 40-41, 66). Indeed, according to Bisada, MONTANA is a famous mark in Egypt. (Id. at 31). He testified that United never used packaging branded with "MONTANA Egypt;" it only used the word MONTANA by itself. (Id. at 58). However, Bisada conceded that he "didn't work on [exporting] at all," but he testified that as far as he knew from what he had heard from others, during the period from 1985 to 1986, United exported to Saudi Arabia, Canada, and the United States. (Id. at 27, 36-37, 45, 49). The fact that Bisada did not work on exporting, along with his apparent misconception about the size of the shipment packages (see n.35 infra), undermines Bisada's credibility as to the manner in which vegetables were packaged for export to Haggar, and bolsters Haggar's position that smaller bags of vegetables were used for export to the United States.

29

Maamoun testified that United used the MONTANA mark on its products "[s]ince we started producing, from the day we started. . . " around "the end of '84" (Tr. at 255), and that from the beginning, the MONTANA marks were "printed and put on the bag, the logo, trade, the name, and everything." (Id. at 255-56). Moreover, Maamoun testified that United never used the two word term "Moon-tana" in its mark. (Id. at 275).

Maamoun identified three examples of these packaging bags, depicting the logo of "the boy and the girl, and this is the ice mountain," with the word mark MONTANA.[31] (Id. at 258-59, 260, 261; Defs.' Exs. BJ, BL, CA). According to Maamoun, these examples reflect the basic design of the packaging bag United has used since 1984, for every shipment "to all countries." (Tr. at 259-61, 263-65; see also Defs.' Exs. CD, CE, BF). According to Maamoun, the bags, which were printed by companies in Egypt (Tr. at 256), are the same as the bags that United ships to overseas destinations.[32] (Id. at 264). Indeed, Maamoun claims that these were the same bags in which United's frozen food products were shipped into America "[i]n [the] end of '85, '86, something like that." (Id. at 260-61). Maamoun testified that United has never given

_____

[31] The images on the packaging bags identified by Maamoun are identical to the two chefs logo. Therefore, it appears that Maamoun's reference to the "boy and the girl" refer to the male and female chefs depicted in the two chefs logo.

[32] In addition, Maamoun testified that United uses the MONTANA mark on its "distribution cars," its "trucks," its "big refrigerator," and its plane. (Id. at 267). Indeed, United began with 40 trucks and now has over 200, and "[a]ll the trucks have all the pictures. . . . [O]n the front of the truck was the word MONTANA, everything is in English and Arabic and the picture of the boy and girl as well." (Id. at 267-68; Defs.' Ex. GC). Maamoun testified that some time after 1997, United also used the MONTANA mark in its advertisements, which were distributed "all over the world," including in the United States. (Id. at 269; Defs.' Ex. EH). One of United's undated advertisements "specifies. . .that it does exporting product from vegetables to food, to most of countries in the world, among them United States, Canada, Australia, and Western Europe countries, France, Britain, Italy, Switzerland, Vienna, Belgium, Germany, Holland, and other countries like Saudi Arabia, Kuwait, Bahrain, Jordan, Lebanon, [and] Liberia." (Id. at 270; Defs.' Ex. DI).

another company permission to use its packaging bags (id. at 276), and it has never shipped another company's product in its packaging. (Id. at 278).

Maamoun stated that in Egypt, "[y]ou cannot ship without the name and the mark." (Tr. at 256). Accordingly, as of September 1986, United had commercially registered the mark MONTANA for "[t]he company Montana, United Company of Montana, for producing products – United Company for manufacturing products, nutritional products, called Montana." (Id. at 238-39, 251; Defs.' Ex. BU (showing "the commercial registration and the stamp of the government," dated September 6, 1986)). According to Maamoun, United used the marks on its business documents as well, including its invoices. (Id. at 258). For example, Maamoun identified Defendants' Exhibit BG as an invoice for a sale of MONTANA-branded grape leaves and okra. The invoice, dated May 11, 1985, bears the mark MONTANA. (Id. at 256-58; Defs.' Ex. BG).

Strikingly, even Haggar's own witness, Alfi al Masri, testified that United, not Haggar, first chose the brand name MONTANA and created the two chefs logo; he also admitted that the first goods sent to Boulos displayed this branding and logo. (Defs.' Ex. HF at 25). Asked about the origin of the MONTANA brand name, al Masri explained that although he advised Mamdouh Maamoun to base his brand name on the name of his younger daughter, United did not follow this advice and instead chose the word MONTANA, which has nothing to do with Maamoun's daughter. (Id. at 25-26).

Mr. al Masri conceded that he did not provide the plastic bags to United for packaging the frozen vegetables that he shipped to Boulos, but he did give United instructions about the details to be written on the packaging in order to comply with United States regulations. (Id. at 22). Mr. al Masri acknowledged that United printed sample bags with the MONTANA name on

31

them and provided them for his review.  (Id. at 22-23).

Mr. al Masri confirmed that he shipped "many tons, about 200 tons" of United's goods featuring the two chefs logo and the MONTANA name; however, he testified that he was not familiar with the ice mountain logo.  (Id. at 27).  Nevertheless, he explicitly stated that United, not Haggar, owns the logo and trademark displayed in Plaintiff's Exhibit 3, which is a photocopy of the specimen bag Haggar attached to its 1987 trademark application.  (Id. at 29).

Even given that the Court has "no room for speculation, inference or surmise[, and that]. . . any doubt must be resolved against the charging party," In re Bose Corp., 580 F.3d at 1243, after reviewing the parties' testimonial and documentary evidence, as well as their post-trial submissions, the Court finds that United, not Haggar, invented and first affixed the MONTANA word mark.  Although Boulos claimed to have created the MONTANA name, the Court finds it telling that al Masri unequivocally confirmed that United created the MONTANA mark and printed the packaging bags for the frozen goods it shipped to al Masri and Boulos.  In so testifying, al Masri corroborated the testimony of Maamoun and Bisada that United chose the MONTANA mark shortly after building its frozen food production factory.

As for the cartoon logo, the evidence demonstrates that United was the first to design and use the two chefs logo and the evidence suggests that the shipments to Haggar were for at least some period of time packaged in bags with the two chefs logo and the MONTANA mark.  However, the Court credits Boulos' testimony that he had the mark consisting of the boy with the basket drawn up sometime after he had been importing United's frozen foods.  Although the logo is similar to the two chefs logo in that it consists of a cartoon character, there are substantial differences including the absence of the female figure and the ice mountain and the addition of the basket with vegetables and the star burst.  While this mark may have been designed to avoid

32

the scrutiny of the USPTO, it was clearly designed and first used by Haggar.

   b. Which Party's Name Appeared with the Mark

Turning to the second modified Wrist-Rocket factor, the Court must determine which company's name and identifying information appeared on the packaging with the MONTANA marks for the goods sold in the United States from 1985 to 1989.[33]

Both parties incorporate the contested mark "Montana" in their corporate names and use it on various documents. Plaintiff Haggar International Corporation did business as Montana Food Industries, while defendant United's full corporate name is United Company for Food Industry Corporation (Montana).[34]

United's witnesses, Maamoun and Bisada, testified that from the very beginning, United always packaged their frozen food products in bags bearing the word mark MONTANA, along with United's two chefs and ice mountain logos. (Id. at 259-61, 263-66; see also Defs.' Exs. CD, CE, BF). In fact, Maamoun stated that United used "[t]he same bag the same logo" for every shipment "to all countries," including the United States, and began doing so sometime

---

[33]Although advertisements represent another area where either company's name could have appeared with the mark, neither party presented any evidence of the advertisements for United's frozen vegetables that were displayed in the United States during the 1985 to 1989 period that Haggar and United were in business together. The only testimony concerning which company's name appeared on advertisements was provided by Mr. Joudeh, the chief executive of defendant Trans Mid-East, which only began importing and distributing United's frozen vegetables in 1993, after United and Haggar ceased doing business. Trans Mid-East made a strategic choice to write on its packaging that its goods were from United Company for Food Industry Montana. (Tr. at 458). According to Joudeh, "[i]t was actually part [of] our efforts to advertise that our merchandise is a top quality and it's made by the best company, Montana." (Id.)

[34]United's name sometimes appears with "S.A.E." appended to it. This is a French acronym for Societe Anonyme Egyptienne, which loosely translates to Egyptian Joint Stock Company.

between 1984 and 1986. (Tr. at 260-61, 263-65).[35]

By contrast, Boulos contended that during the period from 1985-1989, when it was importing United's frozen food products, Haggar printed its own packaging bags, which featured the MONTANA mark and Haggar's boy carrying a basket logo; Boulos claimed that Haggar sent these bags to United to be used in packaging the goods instead of United's usual bags. (Defs.' Ex. HB at 63, 66-68, 80-81). Mr. Boulos suggested that Haggar's business arrangement with United called for United to use Haggar's bags to pack the goods and then for United to ship containers full of frozen foods packed in Haggar's bags to the United States for Haggar to sell. (See id. at 79-80; Defs.' Ex. HC at 183, 257-58).[36]

---

[35]Maamoun also testified that United never shipped its frozen vegetables to the United States in bulk, which would have necessitated Haggar repackaging the goods in smaller bags for distribution. (Tr. at 340-41). This testimony, however, seems to contradict Bisada's statement that the vegetables were shipped in 10-12 kilo packages (Defs.' Ex. HH at 24); this appears to be bulk shipment.

[36]Provided with an example of United's packaging materials for its MONTANA-branded goods, Mr. Boulos identified Plaintiff's Exhibit 3 as a photocopy of a falafel packaging bag made by United and marked "production date, December 1986." (Defs.' Ex. HB at 107-09). The bag features the ice mountain and contains the two cartoon chefs logo (id. at 107-08), and the words "Product of Egypt by United Food Company Industry" on the label. (Id. at 109). The writing on the bag included: "Falafel – Montana is making the best vegetables without any chemicals added, and they are doing freezing frozen vegetables coordination to the French and Egyptian law." (Id. at 108-09). Plaintiff's Exhibit 3, a photocopy of another packaging bag, had the word "MONTANA" in several places: on the front panel along with the two cartoon chef logo, on the bottom of the front panel along with the mountain logo, on the back of the package, and then again in small English letters on the left of the package. (Id. at 110-11). Like the first bag, the second bag also contained a statement that "Montana selects first quality vegetables. . .in accordance with the latest French and Egyptian standards." (Id. at 111). Boulos testified that Haggar never sold products in France. (Id. at 103). The bag also stated in English that it was a "Product of Egypt by the United Company of Food Industry." (Id. at 112). Nevertheless, the Court notes that no witness testified about where either of the bags contained in Plaintiff's Exhibit 3 were shipped. It is possible these were bags sent to – or intended for – France, and therefore irrelevant to the question of which company's name appeared with the contested mark in the United States.

34

Rejecting this assertion, Maamoun emphasized that United never allowed its goods to be packaged in bags bearing another company's mark, and that Haggar never requested this. (Tr. at 331-32). Maamoun denied that Boulos or al Masri ever provided United with their own bags, and that United never shipped its frozen food products to Haggar under a private label created exclusively for Haggar. (Id. at 337-38). In sum, according to Maamoun, all frozen food goods shipped to Haggar were shipped in United's MONTANA-branded packaging bags, and United never gave Haggar permission to use United's packaging bags as its own. (Id. at 276).

Mr. Boulos also reviewed Defendants' Exhibit CA, a copy of a label for a package of frozen vine leaves bearing the MONTANA mark across the top of the label, a large rendering of the two chefs logo in the middle along with the words "Product of Egypt by the United Company of Food Industry," and a smaller ice mountain logo at the bottom with MONTANA appearing in an arch above the mountain's peak. (Defs.' Ex. HC at 180; Defs.' Ex. CA). Boulos stated that this is "the first that I ever see MONTANA without Egypt." (Defs.' Ex. HC at 180). In answer to counsel's question about whether Haggar had ever "receive[d] packaging from United. . .such as shown in Defendants' Exhibit" CA, Boulos testified, "No. . .sometimes we had some packaging mixed with ours that showed like in the container, in the same container. Some items will go out of bags, they will pack it in their own. . . ." (Id. at 183). He stated that he never complained to United in writing, only orally, telling United "to always do [my] bags which I printed in Egypt, but some of the items I couldn't print for the whole packaging. . . ." (Id.)

Similarly, Boulos admitted importing taro roots from United, and acknowledged that he had seen Defendants' Exhibit CB, a United food label for taro roots bearing the MONTANA trademark (id. at 184), as well as the words "Product of Egypt by the United Company of Food Industry." (Defs.' Ex. CB). However, although he admitted receiving this packaging from

35

United at some point during their business relationship, he explained that "sometimes it will be coming with the container that is not upon my order. It will come just 100, 200, 300 cartons of this subject, of the MONTANA Egypt." (Defs.' Ex. HC at 184-85). When this happened, Boulos "always" immediately contacted United, "but they said that they run out of bags. . . .they run out of this specific packaging and they are waiting for my package to come and they replaced it with this." (Id. at 185). Boulos suggested that United may have intentionally not used the Haggar packaging bags that he provided: "Maybe they were trying to implant this or maybe force this, their own trademark on the market." (Id.)

Although Mr. Boulos acknowledged that United's label exhibits indicate it was using MONTANA on its food packaging in January 1988, Boulos stated that "as far as I remember, it was not supposed to be MONTANA, it was MONTANA Egypt." (Id. at 186). Nevertheless, he admitted that the label marked Defendants' Exhibit CB was written in English, intended for an English-speaking country, and contained only the MONTANA mark, not MONTANA Egypt.[37] (Id. at 186-87).

Further supporting United's claim and undermining his own, Mr. Boulos explained that in Egypt, the "authority of export" regulates exports, and he identified Defendants' Exhibit FH as a document issued by the "authority of export and import in Egypt," dated October 10, 1985, indicating that United is officially "registered [with] the export authority officials." (Id. at 218-219). Although this document does not mention any trademark associated with United, an amendment to the previous registration, dated September 9, 1986, added the term "MONTANA," not MONTANA Egypt or Moon-tana, as a trademark associated with United's

---

[37]As noted supra n.32, United exported its products to Australia, Britain, and Canada. Labels written in English may have been used for exports to any of these countries.

exports. (Id. at 219-20). Although Boulos contended that "the export authority. . .has nothing to do with the trademark," he admitted that the export authority has the ability to seize products that are not labeled in accordance with their requirements. (Id. at 220-21).

Mr. Boulos acknowledged that United used the word "MONTANA" in invoices for frozen vegetables to be shipped by boat to Alfi al Masri in Los Angeles. (Defs.' Ex. HB at 98-99). Defendants' Exhibit BO, an invoice dated December 20, 1985, bears the United name, the company's address and "MONTANA," written in Arabic. In the description section of the invoice, it states that "all the products are MONTANA mark." (Id. at 99-100). Another invoice for a shipment of goods, dated February 12, 1986, and entitled "First Sale from United to Montana," also contained United's letterhead and the ice mountain logo, with the word MONTANA written above the mountain peak.[38] (Id. at 87-89, 92-93; Pl.'s Ex. 18). Boulos admitted that this was the first invoice sent to him directly in the United States, rather than to al Masri, and that Montana Food Industry, i.e. Haggar, had not sold any product as of the time this shipment from United occurred. (Id. at 89).

When asked to explain why this and another invoice, marked as Defendants' Exhibit FT,

---

[38]The word MONTANA appears in three places on this invoice. (Pl.'s Ex. 18). Nevertheless, Boulos contended that the invoice supported plaintiff's claim that the MONTANA mark was Haggar's brand, not United's. For example, Boulos asserted that the invoice column headed "shipping marks," which contained the word MONTANA as well as a stamp reading "United Co. for Food Industry (S.A.E)" with "MONTANA" again underneath it, referred to "what is shipping in the container. The brand name is MONTANA. . .[a]s far as I know, these were my bags inside the containers," not United's. (Defs.' Ex. HB at 90). However, Boulos admitted that the invoice contained a separate column entitled "description of goods" that did not mention MONTANA, implying that the word's appearance in the "shipping marks" column indicated that it was being used to describe the shipper of the goods, not the brand name of the goods themselves. (Id. at 91). Boulos confirmed that he received the invoice in California and examined it, but he did not recall commenting to United about its use of the MONTANA mark in their logo and stamps or advising them that they should not use Haggar's mark. (Id. at 95-96).

did not say "MONTANA Egypt," which is what Boulos had claimed was United's logo, Boulos asserted that these were merely "the invoice, different from the packaging," and that there was no reason to complain[39] to United about this use of MONTANA because "I am importing my own goods, my own bags. I have buy and sell agreements."[40] (Defs.' Ex. HC at 182).

When shown a letter dated July 4, 1987, which al Masri had sent to United in an effort to "improve the packing" (Defs.' Ex. HF at 56, 58-59), Mr. Boulos, who admitted he had never previously seen Defendants' Exhibit FM, testified that he wanted United to use double bags, putting the frozen vegetables in a clear bag first, and then inside a printed bag. (Defs.' Ex. HC at 259). He explained that there had been problems with "a lot of bags [being] below weight" and the need to have labels on the outer part of the carton that described the validity and production dates, as well as the ingredients of the contents of the carton." (Id. at 225). Although the letter stated that "We hope your company will start at once the preparation of the new bag required for exports to the USA and carrying the following inscription: Packed for Montana Food Industries – P.O. Box, CA, USA" (id. at 261), Boulos denied that this letter indicated that United was packaging the goods in its own bags and not using Haggar's bags; he asserted that the complaints could have referred to Haggar's packaging as well. (Id. at 257-58). However, he admitted that

---

[39]Boulos admitted that he may have seen United's mountain logo with the word MONTANA but did not pay attention to it and never raised an objection with United about it using MONTANA with the mountain "because that's their logo, that was never mind. Why should I raise an objection?" (Defs.' Ex. HC at 178). Boulos clarified that "[a]s long as they say MONTANA Egypt, I don't care" because "they never had ever the right of MONTANA without the word 'Egypt' in it, and that's what it says in the trademark in Egypt. . .they have no rights of MONTANA by itself." (Id. at 178-80).

[40]Similarly, when asked a series of questions about the images and words used by Haggar and United in their marks, Ms. Boulos acknowledged that the United logo pictured on the July 15, 1988 invoice marked as Plaintiff's Exhibit 65 contained the word MONTANA – not "Moon-tana" or "Montana Egypt" – on top of the mountain in the logo's center. (Tr. at 150).

for some "items we did not have packaging. We used United's." (Id. at 260).

Given al Masri's testimony concerning Defendants' Exhibit FM, Boulos' admission that at times Haggar used United's bags, and the undisputed facts that the specimen bags Haggar submitted to the USPTO in support of its 1987 application contained the words "Product of Egypt by the United Company of Food Industry," the Court finds that at least some of the frozen vegetables that Haggar sold in the United States from 1985 to 1989 were packaged in bags labeled with United's company name and with the MONTANA mark. Without testimony or documentary evidence reflecting what percentage of the bags in the commercial marketplace during this time period carried the MONTANA mark with either United's or Haggar's names, it is impossible for the Court to determine exactly how the branding appeared to the public, and how closely the public associated either company with the MONTANA food product. While the Court finds that the evidence with respect to this second modified Wrist-Rocket factor favors United, the Court is not persuaded that defendants have met their burden of proof by clear and convincing evidence.

### c. Which Party Maintained the Quality and Uniformity of the Product

The third Wrist-Rocket factor requires the Court to evaluate which company was responsible for maintaining the quality of the product. Here, it is undisputed that United exercised full control over the operations of the packaging factory and the quality and uniformity of the food product. However, the evidence is equally clear that Haggar, not United, was the company that monitored product quality in the United States marketplace and addressed problems with the product as they arose.

As a general matter, Maamoun testified that United ensures the quality of its products through "medical administration. . .and a license." (Tr. at 377). He described United's quality

39

control process as involving several layers of review, but he admitted that even using those "American techniques," "it's possible for merchandise to come from us wrong," and stated that even "Coca Cola Company. . .has mistakes." (Id. at 440). According to defendants, the Egyptian Ministry of Health reviews a random sampling of 10 percent of a company's shipments. (Id. at 444). Defendants introduced Exhibit CK, a report from the Egyptian Ministry of Health, dated January 26, 1986, stating that it had reviewed a single shipment of United products. (Id. at 441, 443-44).

Although United ran quality control at the factory level, it was Haggar that responded to quality concerns from American customers. Ms. Boulos identified Plaintiff's Exhibit 51 as a telex, dated March 23, 1988, signed by Boulos and sent from al Masri's office to Mr. Maamoun at United (id. at 98, 102; Pl.'s Ex. 51), which stated: "We received complaint from our lawyer in California that some customers were sick eating Montana products. We don't have complete info yet, need all about documents to get insurance." (Id. at 98; Pl.'s Ex. 51). According to Ms. Boulos, this was "a very serious matter," requiring her father, al Masri, to pay a lawyer to deal with the complaint; United did not reimburse him for this expense, and that "whenever there is a complaint anything [al Masri] was taking the responsibility." (Id. at 99-100; Pl.'s Ex. 51). Indeed, she stated that al Masri was never reimbursed by United for goods that arrived in a damaged condition. (Id. at 541).

Maamoun acknowledged that Boulos was the one who informed United that there had been a problem with the merchandise in one of its shipments to Haggar, and that consequently the customer rejected some of it. (Id. at 440). However, Maamoun denied any awareness of the notice from Customs, indicating that it had seized and subsequently destroyed one of Haggar's shipments due to the contaminated MONTANA-branded products within. (Id. at 446-49; Defs.'

Ex. D).

Mr. al Masri monitored, maintained, and worked to improve the quality of the goods Haggar was selling in the United States, writing the letter in July 1987, seeking to "improve the packing" of the goods because the quality had deteriorated significantly. (Defs.' Ex. HF at 56-60; Defs.' Ex. HC 224-25). It was also al Masri, not United, who appears to have been monitoring United's compliance with United States packaging and labeling laws. (Tr. at 78-79, 112-13). In February of 1989, another container imported from United was stopped by the Department of Health and Human Services, in Los Angeles, and detained because of labeling issues: "mandatory labeling omitted, false or misleading labeling." (Id. at 107-08, 109; Pl.'s Ex. 62). Ms. Boulos explained that her husband, Mr. Boulos, took care of the problem and that, although it took some time to resolve, the container was eventually released by the FDA. (Id. at 109-10).

Given United's hands-off approach to the United States market, the Court finds that United has failed to carry its burden to show by clear and convincing evidence that United was responsible for maintaining the quality and uniformity of the product in the United States. While United maintained the factory where the goods were produced, it also appears that United primarily left Haggar to fend for itself in the United States market and that ultimately, it was al Masri and Boulos who acted to ensure the quality and appropriate labeling of the goods. Thus, the third modified Wrist-Rocket factor favors Haggar.

### d. With Which Party the Public Identified the Product and Made Complaints

With respect to the public's perception of the MONTANA brand and its source, Joudeh testified that during the period from 1991 to 2002, when he was not importing United's MONTANA-branded products, his customers often approached him and asked for MONTANA-

branded goods, either specifying that they wanted United's MONTANA brand or asking in a way that he understood to mean that they were only interested in the MONTANA-branded goods that were produced by United. (Tr. at 473, 475-76). According to Joudeh, "all the middle east people" were interested in buying United's MONTANA brand, and while it was not available in the United States from 1995 to 2002, he did see it sold in Jordan and Lebanon during this period. (Id. at 474-75).

Hala Boulos disputed this testimony, claiming that customers were not conscious of the company names behind the products. According to Ms. Boulos, when United resumed exporting goods to the United States in approximately 2005 or 2006, this caused confusion among the customers because: "They have a MONTANA white bag. My MONTANA bag is a green bag. So when you go to a supermarket and you ask I want MONTANA Molokhia bag, [you have to specify] the white or the green." (Id. at 147-49).

Ms. Boulos also testified that it was Haggar, rather than United, that made the product known in the United States. (See discussion supra at Part I. A. 1). Hala and Sherif Boulos began selling United's frozen vegetables when they were still relatively unknown to United States consumers. (Defs.' Ex. HF at 38). As Ms. Boulos testified, it would take Haggar 3 to 4 months to sell a container, and that they had to work particularly hard in order to sell the very first container they received, going door to door to local supermarkets and retailers for 4 months to convince them to carry the goods. (Tr. at 534-35). Similarly, Alfi al Masri testified that prior to Mr. Boulos' efforts, United's name and brand was not well-known, let alone "famous," in the United States: "[Sherif makes the distribution and he make a name. [. . .] Without Sherif, nobody can knows about United." (Defs.' Ex. HF at 38).

The parties provided very little testimony and documentary evidence that speaks to the

question of to whom the public made complaints. The only complaint from purchasers discussed at trial was the lawsuit filed by people who got sick from eating vegetables from a contaminated shipment. (See discussion supra at Part I. A. 1. c). Although the complaint allegedly named United as the defendant (Defs.' Brief at 13 (citing Defs.' Ex. HF at 76)), it was Haggar's lawyer who fielded the calls and handled the case, and it was al Masri who paid the legal expenses. (Tr. at 112-13).

Since, on balance, the evidence shows that it was Haggar that made the product known among United States consumers and responded to their complaints, the Court finds that United has not met its burden to prove that the public identified the source of the products as United. Accordingly, the Court finds in favor of Haggar on the fourth modified Wrist-Rocket factor.

e. Secondary Factors

Some courts also consider which party paid for advertising, Autotech Tech. Ltd. P'ship v. Automationdirect.Com, Inc., 2007 WL 2388794, at *3, "which party possesses the goodwill associated with the product, [and] which party the public believes stands behind the product. Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d at 403 (internal citations and quotations omitted). Here, neither party presented any evidence relating to advertisements for United's frozen vegetables that were displayed in the United States during the 1985 to 1989 period. (See n.33 supra). However, for the reasons discussed above, the Court finds that Haggar possessed the goodwill associated with the product and was perceived by the public to stand behind the product in the United States. Consequently, in assessing the evidence presented here, the Court finds that the latter two modified Wrist-Rocket factors, as well as the secondary factors, favor Haggar. Further, although the evidence presented tends to favor United, defendants have not met their burden of proof with respect to the first two Wrist-Rocket factors.

## f. Subjective Intent to Deceive

As previously discussed, for United to prevail in its challenge to Haggar's registration on the basis of fraud, United must prove, by clear and convincing evidence, that Haggar deliberately and deceitfully misrepresented itself to be the owner of the MONTANA mark in its 1989 application to the USPTO. (See discussion supra at Part I. A).

The evidence suggests that United knew of Haggar's interest in acquiring rights to the mark as early as 1988 when United received the letter from Haggar's attorney, Mr. Mund, asking United to assign the rights to the MONTANA mark to Haggar. (See Defs.' 2009 56.1 Stmnt ¶ 28; Pl.'s 2009 56.1 Stmnt ¶ 28; Pl.'s Ex. 22). United appears to have ignored the letter, as well as follow-up letters Mr. Mund sent dated July 1, 1988 and August 1, 1988. (See Tr. at 119-20). United neither replied to Mund's letters nor immediately took steps in response to secure its own rights.[41] Thus, it would have been reasonable for Boulos to believe that United did not intend to assert ownership over the MONTANA mark when Haggar submitted its 1989 USPTO application.[42]

---

[41]United contends that it "refused" to assign its rights in the MONTANA mark to Haggar. (Defs.' 2009 56.1 Stmnt ¶ 28). However, it has produced no written evidence documenting such a refusal. In contrast, Haggar asserts that United never responded to the request at all. (Pl.'s 2009 56.1 Stmnt ¶ 28). The parties agree United never signed Mund's letter.

[42]Further, the Court notes that the evidence demonstrates that United showed a general lack of interest in the MONTANA mark even after its relationship with Haggar ended. United never attempted to register the MONTANA mark during the time it was doing business with Haggar, and it waited almost three months after Haggar submitted its second USPTO application before filing its own application for registration with the USPTO. (Pl.'s 2006 56.1 Stmnt ¶¶ 13, 17; Pl.'s Ex. 67). United's application was refused and the USPTO sent United a "non-final action" letter on August 16, 1990. (Id.) United never responded to this letter from the USPTO and abandoned its own application on February 20, 1991, "pursuant to the advice of U.S. counsel," without contesting Haggar's registration. (Pl.'s 2006 56.1 Stmnt ¶¶ 14-15, 17; Pl.'s Brief at 14, 18; Pl.'s Ex. 66). Additionally, Customs seized a container of United products bearing the MONTANA mark that had been imported by Nile in the summer of 1995, based on

Additionally, the <u>Wrist-Rocket</u> factors favoring Haggar provide further support for the contention that Boulos did not have "subjective intent to deceive" when he signed the 1989 USPTO application. <u>In re Bose Corp.</u>, 580 F.3d at 1243 (quoting <u>Kemin Indus., Inc. v. Watkins Prods., Inc.</u>, 192 U.S.P.Q. 327, 329 (T.T.A.B.1976)) (holding that "there is 'a material legal distinction between a "false" representation and a "fraudulent" one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like'"). Here, not only was Boulos responsible for making the product known in the United States under the MONTANA mark, but he was also responsible for generating good will, maintaining the quality of the product in the United States, and responding to consumer complaints. Boulos seems to have been generally unfamiliar with the complexities of U.S. trademark law, as demonstrated by his remark that the two chefs logo was "not a trademark, that's a logo" (Tr. at 191-92), and by his testimony that he was not United's distributor but rather sold the goods for al Masri. (Defs.' Ex. HB at 61). While this lack of knowledge or misunderstanding does not justify his applying to register a mark that was not technically his, it goes to his state of mind and supports the plaintiff's argument that Boulos believed that United had no interest in the MONTANA mark in the United States. <u>See</u> <u>Yocum v. Covington</u>, 216 U.S.P.Q. at 216-17 (noting that "erroneous conception of rights" may counter a finding of fraud). This belief appears all the more reasonable when considered in light of United's failure to respond to Mund's letters seeking the right to register the mark. United's

---

Haggar's claimed ownership of the MONTANA mark. (Defs.' 2009 56.1 Stmnt ¶ 46; Pl.'s 2009 56.1 Stmnt ¶ 46). It can be inferred from this fact that United did not attempt to use the MONTANA mark in the United States until 1995. Thus, United's actions bolster the support for Haggar's contention that Boulos had a reasonable basis upon which to believe that United did not possess superior rights to the MONTANA mark.

failure to claim the mark as its own – indeed, its failure to respond at all – suggests that United was not concerned with the fate of the mark and gave Boulos at least "a reasonable basis for believing that no one else ha[d] the right to use the mark in commerce." Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1908.

In short, even if defendants could show that Haggar did not actually own the MONTANA mark when Boulos submitted Haggar's 1989 USPTO application - a point on which the Court finds the evidence to be equivocal - defendants have failed to carry their heavy burden of showing by clear and convincing evidence the deliberate misrepresentation necessary to overcome the incontestible status of plaintiff's mark. See In re Bose Corp., 580 F.3d at 1243. Considering the especially high burden placed on the party charging fraud against one who has signed an oath, see id.; Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc., 78 U.S.P.Q.2d at 1908, United has failed to prove that Haggar's assertion of ownership constituted a deliberate and material misrepresentation of fact in connection with its application.

    2.    Date of First Use

Defendants' second claim of fraud is based on the statement by Haggar in its 1989 trademark application that "Haggar's claimed date of first use of the mark was months earlier than when it placed its first order with United." (Defs.' Brief at 35). It is undisputed that in its application, Haggar represented that it first used the MONTANA mark in commerce on September 1, 1985. (Pl.'s Ex. 6; Defs.' Ex. HB at 68, 136-38; Defs.' 2009 56.1 Stmnt ¶ 36; Pl.'s 2009 56.1 Stmnt ¶ 36), and the evidence suggests that the actual date of first use was later, in 1986. (See Tr. at 433-436).

Specifically, when asked at his deposition, Mr. Boulos could not recall when Haggar made its first sale in the United States. (Defs.' Ex. HB at 70-71, 76). Although when he was

shown Defendants' Exhibit GI,[43] he confirmed that February 12, 1986 was the date Haggar first used MONTANA as a trademark. (Id. at 85, 87-88). This was supported by an invoice for a shipment of goods, dated February 12, 1986, on which someone had handwritten "First Sale from United to Montana" on the top. (Id. at 87-88; Pl.'s Ex. 18). Boulos admitted that this was the very first invoice sent to him by United directly and that Haggar had not sold any product as of the time this shipment from United took place. (Id. at 89).

Similarly, Ms. Boulos stated that Haggar did not receive its first shipment of MONTANA-branded products until sometime "in early '86." (Tr. at 176; Defs.' Ex. BO). This evidence seems consistent with Mr. Mund's letter to Mr. Lyon, which states that the first meeting between the parties occurred in "approximately September of 1985." (Defs.' Ex. AT at 1). Thus, it is clear that, as of September 1, 1985, no shipment of United's goods had arrived in the United States, and therefore Haggar could not have sold any goods marked with the MONTANA brand as of this date. Accordingly, the date of first use as indicated on the application to the USPTO was not accurate.

However, even if Haggar provided an inaccurate date of first use in its 1989 trademark application, this alone does not constitute fraud on the USPTO. To rise to the level of fraud, the false statement must be made knowingly and have been material to the USPTO's decision to grant Haggar's trademark application. Mister Leonard, Inc. v. Jacques Leonard Couture, Inc., 23 U.S.P.Q. 2d 1064 (T.T.A.B. 1992). First, plaintiff argues that when the application to the USPTO was prepared, it was Haggar's attorney, Alan Mund, who chose to list September 1, 1985 on Haggar's trademark application as the date the name and logo were first used (Defs.'

_____

[43]Exhibit GI is plaintiff's responses to United's interrogatories.

Ex. HB at 77): Boulos testified that "[i]t was not me. It was the lawyer." (Id.) Boulos further claimed that he did not give Mund the dates to enter on the 1989 trademark applications. (Id.)

More importantly, it is unclear that the date of first use was material in this case. Given that there was no simultaneously pending application by United or anyone else competing to register the MONTANA mark, even if the date of first use was actually 1986, it is not clear to the Court that the date of first use would have factored in any significant way into the USPTO's decision. The distinction between 1985 and 1986 only becomes relevant and material if the USPTO had to determine which of two companies had the superior claim because of first use in United States commerce.

Again, the burden is on defendants to prove by "clear and convincing" evidence that Boulos had a subjective intent to deceive the USPTO, and the Court must apply this standard strictly. American Flange & Manufacturing Co. v. Rieke Corp., 80 U.S.P.Q. 2d 1397, at *26 (T.T.A.B. 2006). In applying this standard, it must resolve "any doubt. . .against a finding of fraud." Standard Knitting Ltd. v. Toyota Jioshia Kabushiki Kaisha, 77 U.S.P.Q. 2d 1917, 1926 (T.T.A.B. 2006). Indeed, "[f]raud in trademark cancellation. . .must be proved to the hilt with little or no room for speculation or surmise, [but allow] considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission. . . ." Yocum v. Covington, 216 U.S.P.Q. at 216.

Even if there was a mistake made in the date listed on the application, it is unclear that Boulos was responsible for the error or that it was made with the intent to deceive the USPTO. Moreover, it appears that the exact date of first use was immaterial in this case. Thus, the Court finds that defendants have failed to meet their burden of showing by "clear and convincing evidence" that Haggar's claimed date of first use was either material to the USPTO's decision or

48

that Boulos knowingly stated a false date of first use with intent to deceive. Defendants have failed to prove deliberate fraud on the part of Mr. Boulos.

3.    The Specimen Bags

Finally, the Court turns to the third of defendants' fraud claims – namely, that Haggar committed fraud in providing packaging bags in support of its 1989 trademark application that did not contain any reference to United as the manufacturer of the frozen food products contained inside.

It is undisputed that in December 1987, plaintiff Haggar filed a trademark application with the USPTO for the word mark "MONTANA" and that, with its application, Haggar submitted several packaging bags, marked "Product of Egypt by The United Food Company for Food Industry." (Defs.' 2009 56.1 Stmnt ¶¶ 22-23, 25; Pl.'s 2009 56.1 Stmnt ¶¶ 22-23, 25). It is further undisputed that thereafter, Haggar failed to respond to a request from the USPTO for additional documentation as proof of ownership of the MONTANA word mark, and the application was deemed abandoned as of November 4, 1988. (Defs.' 2009 56.1 Stmnt ¶¶ 25-27; Pl.'s 2009 56.1 Stmnt ¶¶ 25-27).

In March of 1989, Haggar independently obtained new packaging from Egypt that bore the MONTANA mark, but which eliminated the mountain peak drawing and depicted a cartoon boy chef with a basket, in contrast to the two chefs logo previously used by United. (Defs.' 2009 56.1 Stmnt ¶ 31; Pl.'s 2009 56.1 Stmnt ¶ 31; Defs.' Exs. AT, DI, FJ). On this new packaging, Haggar used the name "Montana Food Industries" without any reference to United. (Defs.' 2009 56.1 Stmnt ¶¶ 29, 31; Pl.'s 2009 56.1 Stmnt ¶¶ 29, 31).

The parties agree that any business relationship between United and Haggar ended in July of 1989 and that the last shipment of goods from United to Haggar was sent at this same

time. (Defs.' 2009 56.1 Stmnt ¶¶ 32-33; Pl.'s 2009 56.1 Stmnt ¶¶ 32-33). On August 1, 1989, Alan Mund sent a letter to all of United's MONTANA retailers, but not to defendant United, claiming that Haggar owned the MONTANA mark and that in "'an effort to preclude further infringement of Montana's goodwill, Montana has redesigned its labeling and packaging.'" (Defs.' 2009 56.1 Stmnt ¶ 35; Pl.'s 2009 56.1 Stmnt ¶ 35). Haggar filed its 1989 trademark applications for the word mark MONTANA and the boy with a basket logo the following day. (Defs.' 2009 56.1 Stmnt ¶ 36; Pl.'s 2009 56.1 Stmnt ¶ 36). Haggar's 1989 applications omitted any reference to United or its previous trademark application for the MONTANA mark.[44] (Defs.' 2009 56.1 Stmnt ¶¶ 36-38; Pl.'s 2009 56.1 Stmnt ¶¶ 36-38).

The question before the Court is whether Haggar fraudulently submitted the new specimen bags, without reference to United, in an attempt to deceive the USPTO about the true origin of the goods branded with the MONTANA mark. As with the questions of ownership of the mark and the date of first use discussed above, the burden is on United to prove by "clear and convincing" evidence that Haggar committed fraud.

Ms. Boulos testified that at the "[e]nd of '89, beginning of '90," Haggar began buying its goods in bulk from a different company in Egypt and repackaging them in California for sale in the United States. (Tr. at 114). "[W]e gave [the Egyptian bulk seller] the bags to put in the, to fill them with the product," and then Haggar paid an Irvine, Orange County, California-based company named Cleugh's Rhubarb to sort and pack the goods in the United States. (Id.)

With respect to the second trademark application, Ms. Boulos testified that Haggar relied

---

[44]Defendants have not proffered any reason why plaintiff would have been required to disclose its abandoned 1987 trademark application when it submitted its renewed application in 1989.

on the advice of Mr. Mund to "change your packaging in order to reflect the name [and] address of the manufacturer, distributor, or packager of the product." (Id. at 185; Pl.'s Ex. 21). Thus, Defendants' Exhibits FJ and DI depict "[t]he boy with the basket," along with the word "MONTANA," listing the company's name as "Montana Food Industries, 13610 Ventura Boulevard, Sherman Oaks," an address Ms. Boulos acknowledged that Mr. Boulos used as the mailing address for Haggar for a period of time. (Id. at 192-95; Defs.' Exs. FJ, DI). The word United does not appear on the packaging. (Id. at 195).

According to Ms. Boulos, as of August 2, 1989, Haggar was not "doing any business in the United States with goods packed by United." (Id. at 128). Thus, in the August 2, 1989 trademark application, the paragraph in the application describing how Haggar was "processing and dealing with goods at that time," including its reference to Cleugh's Rhubarb, was "an accurate statement." (Id. at 127-28, 131; Pl.'s Ex. 5). The application included documents describing the Montana frozen vegetable bags that Haggar was using in 1989 to distribute food products from Cleugh's Rhubarb "to the states." (Id. at 129; Pl.'s Ex. 5).

Since it remains undisputed that Haggar had terminated its relationship with United prior to Haggar's filing of its 1989 trademark application, and that Haggar was acquiring frozen food products from another source (Tr. at 114; Defs.' 2009 56.1 Stmnt ¶¶ 32-33; Pl.'s 2009 56.1 Stmnt ¶¶ 32-33), the Court concludes that it would have been improper for Haggar to submit bags that included United's name when it applied for registration of the mark in 1989. At the very least, given that "any doubt [must be resolved]. . .against a finding of fraud," Standard Knitting Ltd. v. Toyota Jioshia Kabushiki Kaisha, 77 U.S.P.Q. 2d at 1926, the Court finds that the defendants have failed to prove by "clear and convincing" evidence that the omission of United's name from the specimen bags submitted in support of Haggar's 1989 application was

knowingly fraudulent.[45]

Therefore, in sum, the Court finds that defendants have failed to prove that plaintiff obtained its trademark registrations through fraud. Accordingly, plaintiff's trademark for MONTANA retains its incontestable status against this challenge.

B. Prior Use

The Court now turns to defendants' "prior use" defense to the incontestable status of plaintiff's MONTANA trademark. In a letter filed with the Court on March 4, 2011, in conjunction with the parties' preparation of the Joint Proposed Pre-trial Order, United notified the Court that it intended to raise a "prior use" defense to plaintiff's claim that its registered mark had achieved incontestable status. In a letter motion response, filed March 8, 2011, plaintiff sought an Order precluding defendants from raising such a defense due to its alleged "legal futility." Finding that material questions of fact remained to be determined before the Court could evaluate the propriety of a "prior use" defense, the Court denied plaintiff's request to preclude defendants from raising the "prior use" defense.

In addition to fraud, the "prior use" defense is available under certain circumstances to defeat a trademark holder's claim that a mark has become incontestable. 15 U.S.C. § 1115(b)(5). The substance of this defense is as follows:

> That the mark whose use by a party is charged an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with

---

[45]Defendants argue that Haggar committed fraud because the final shipment of United's goods occurred on July 18, 1989, making it likely that the shipment arrived after Haggar submitted its application and suggesting that Haggar was still selling United's goods after their relationship ended and after filing its application. (Defs.' Brief at 35). However, defendants have failed to provide "clear and convincing" evidence that the shipment ever actually arrived in the United States, or that Haggar sold those goods.

him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title. Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved. . .

15 U.S.C. § 1115(b)(5). In essence, in order to establish a "prior use" defense, the defendants must show that United was a prior user of the mark in the United States, see De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, 440 F. Supp. 2d at 269, and that its use of the mark was "continuous and uninterrupted" from a date prior to plaintiff's registration to the present. Id.; see also Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., 477 F.2d 150, 153 (6th Cir. 1973); Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1353-54 (E.D.N.Y. 1994).

In its March 8, 2011 letter and subsequent memorandum, filed on March 31, 2011, seeking to preclude defendants from raising a "prior use" defense, plaintiff argues that defendants could not possibly demonstrate the statutorily required prerequisite of "continuous use" of the contested mark from a time prior to Haggar's registration through the present because United admitted to not using the MONTANA mark in the United States for the six year period from 1997-2002.

However, interruption in the continuous use of a mark does not automatically preclude a party from relying on the "prior use" exception to incontestability. See City of New York v. Tavern on the Green, L.P., 427 B.R. 233, 242 (S.D.N.Y. 2010) (holding that defendant restaurant's two year break in the chain of use due to renovations was excused due to its clear intent to resume use of the mark once construction was complete); Cuban Cigar Brands v.

53

Uppman International, 457 F. Supp. 1090 (S.D.N.Y. 1978), aff'd, 607 F.2d 995 (2d Cir. 1979). In Cuban Cigar Brands, the court held that "[a] party could bridge the gap in actual sales if sufficient showing were made of good will remaining after the use was halted and that the party had the intent to resume use." 457 F. Supp. at 1100, n.43 (holding that Cuban cigar company did not lose the ability to raise a prior use defense when its exports to the United States were interrupted by the American government's embargo of Cuba) (citing Casual Corner Assoc. v. Casual Stores of Nevada, Inc., 493 F.2d 709 (9th Cir. 1974)). Here, United would have to show that United States customers retained the association between MONTANA-branded goods and United, even after United stopped using the mark in the U.S. market for six years, and that United continuously manifested the intent to resume use as soon as governmental obstacles were removed.

In addition, plaintiff contends that defendants should be precluded from raising a "prior use" defense because in order for defendants to argue that the six year break in use should not affect defendants' ability to contest the mark, defendants would have to show that Haggar acted inequitably in enforcing its trademark registration. This, in turn, requires defendants to prove that Haggar obtained the registration with "unclean hands." According to plaintiff, any attempt to prove Haggar's "unclean hands" would rely upon the same proof, and be evaluated under the same "clear and convincing" standard, as defendants' fraud defense, and would thus be redundant and a waste of judicial resources.

It is undisputed that United's use of the mark in the United States was not "continuous and uninterrupted." Indeed, it is undisputed that United did not attempt to distribute its MONTANA-branded goods in the United States between 1995, when the Nile shipment was seized by Customs (Defs.' 2009 56.1 Stmnt ¶¶ 46-47; Pl.'s 2009 56.1 Stmnt ¶¶ 46-47), and 2002,

when United resumed sales in the United States through Trans Mid-East and attempted to challenge Haggar's registration of the mark.

Although United, citing Cuban Cigar Brands v. Uppman International, 457 F. Supp. at 1100, n.43, claims that this break in use is excusable because it was prevented from using the mark due to Haggar's enforcement of its trademark ownership rights through the involvement of Customs, this argument is unpersuasive because, as discussed above, the Court finds that Haggar did not acquire its trademark of the MONTANA mark by inequitable means. In addition, although Cuban Cigars suggests that "[a] party could bridge the gap in actual sales if sufficient showing were made of good will remaining after the use was halted and that the party had the intent to resume use," United has made no such showing. Indeed, United only presented evidence that it sought to assert its rights to the mark against Haggar in Egypt. United has failed to show that United States customers retained the association between MONTANA-branded goods and United, after United stopped using the mark in the U.S. market for six years.

Accordingly, the Court finds defendants' "prior use" defense to the incontestability of Haggar's MONTANA mark unavailing. Consequently, Haggar is entitled to the full benefits of the mark's now incontestable status. Given this finding, the Court finds that Haggar owns the exclusive right to use the MONTANA mark in the United States. See 15 U.S.C. § 1115(b); see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. at 117.

The Court also finds that plaintiff has established that the MONTANA word mark "is distinctive as to the source of the" goods at issue here and "that there is the likelihood of confusion between" Haggar's MONTANA-branded goods and United's. See ITC Limited v. Punchgini, Inc., 482 F.3d at 154. Accordingly, the Court holds that United, by virtue of its use of an identical word mark for virtually identical goods, has infringed on Haggar's exclusive

55

rights to the MONTANA mark in the United States, and that United is not entitled to maintain its registration for the MONTANA word mark on the federal trademark registry.

III. Haggar's Defenses to United's Counterclaims

Having found that defendants have not proved either of their proffered defenses by clear and convincing evidence, the incontestible status of the MONTANA mark is conclusive evidence of Haggar's exclusive ownership of the mark. Therefore, United's counterclaims of infringement against Haggar must be denied and the Court's analysis need not proceed further. However, in the interest of completeness, the Court entertains Haggar's contention that United's counterclaims are barred by the equitable defenses of laches and acquiescence. The Court now turns to an analysis of Haggar's equitable defenses.

A. Laches

Defendants assert counterclaims of, inter alia, infringement and unfair competition, to which Haggar raises the equitable defense of laches. The defense is only available "to one who possesses a right which is firmly planted in good faith. . . ." Anchor Savings Bank FSB v. Anchor Equities, Ltd., No. 86 CV 1623, 1988 WL 70645, at *6 (E.D.N.Y. June 2, 1988), aff'd, 872 F.2d 1021 (2d Cir. 1989). "[A] party asserting an equitable defense such as laches must demonstrate that it comes before the court with clean hands." Road Dawgs Mortorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc., 679 F. Supp. 2d 259, 279 (N.D.N.Y. 2009) (citations omitted); see also Freedom Calls Found. v. Bukstel, No. 05 CV 5460, 2006 WL 845509, at *23 (E.D.N.Y. March 3, 2006) (citing Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999)); Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. at

814.

Although defendants argue that "Haggar has unclean hands because it adopted United's mark with knowledge of United's superior trademark rights. . .[and] committed fraud on the PTO when it applied for and obtained a trademark registration for 'MONTANA,'" (Defs.' Brief at 56), the Court finds that Sherif Boulos had a good faith basis to believe that Haggar owned the superior right to the MONTANA mark when he signed the application oath in support of Haggar's 1989 trademark application. (See discussion supra Part II. A. 1). Thus, in order to prevail on its laches defense, Haggar must show that: (1) United had knowledge of Haggar's allegedly infringing use of the MONTANA mark; (2) that United inexcusably delayed in taking action to enforce its rights; (3) that Haggar will be prejudiced if United is permitted to assert rights to the MONTANA mark; and (4) that Haggar operated in good faith in its use of the mark. See Fusco Grp., Inc. v. Loss Consultants Int'l Inc., 462 F. Supp. 2d 321, 329 (N.D.N.Y. 2006) (citing McDonald's Corp. v. Druck & Gerner, P.C., 814 F. Supp. 1127, 1136 (N.D.N.Y. 1993) and Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. at 1356).

### 1. Whether and When United Knew of Haggar's Use of the Mark

As discussed previously, the evidence suggests that United knew of Haggar's interest in acquiring rights to the MONTANA word mark as early as 1988 when United received the letter from Haggar's attorney, Mr. Mund, asking United to assign the rights to the mark to Haggar. (See discussion supra Part I. A. 1. f). United appears to have ignored the letter, as well as follow-up letters that Mr. Mund sent dated July 1, 1988 and August 1, 1988. (Id.) United neither replied to Mund's letters nor immediately took steps in response to secure its own rights. (Id.)

On October 25, 1989, United filed its own application for registration with the USPTO

57

but the application was refused and United was sent a "non-final action" letter dated August 16, 1990 notifying United of Haggar's registration. (Pl.'s 2006 56.1 Stmnt ¶¶ 13, 17). United never responded to this letter from the USPTO and abandoned its own application on February 20, 1991, "pursuant to the advice of U.S. counsel," without contesting Haggar's registration. (Pl.'s 2006 56.1 Stmnt ¶¶ 10, 14-15, 17; Pl.'s Brief at 14, 18; Pl.'s Ex. 66).

United denies that it learned of Haggar's trademark registration through the 'Non-final action' letter, claiming that the letter was mailed to a lawyer named Timothy T. Tyson[46] but that United never retained Tyson to represent it or to file and/or prosecute application Serial No. 73/834,192." (Defs.' 2007 56.1 Stmnt ¶¶ 13-15, 17). Maamoun testified that United never filed a trademark application in 1990 and that he would have known if the company had hired an attorney to represent it in the United States. (Tr. at 354-55).

However, as noted earlier, at the time of this 1989 application, the Chairman of United was Magdi Maamoun, Mr. Maamoun's brother, and Magdi Maamoun's sworn, signed statements on the Petition to Cancel, directly contradict the characterization of the facts proposed by Mamdouh Maamoun. In that Petition, filed in 2002 and signed by Magdi Maamoun, United states that it filed an application with the USPTO to trademark MONTANA on October 25, 1989 and then abandoned the application on February 20, 1991 "pursuant to advice of U.S. counsel." (Pl.'s Ex. 66; Tr. at 426). Accordingly, the Court does not credit Mamdouh Maamoun's self-serving testimony, and finds that United had actual knowledge of Haggar's use of the

---

[46]Although Mr. Tyson did not testify at trial, and it appears that he was not deposed prior to trial, he submitted a declaration stating that he had "no documents or records concerning [his] involvement in this matter." (Declaration of Timothy T. Tyson, Esq., dated December 19, 2006 at 2). Plaintiff claims that Mr. Tyson has "no recollection of the circumstances" surrounding the instant controversy. (Pl.'s Brief at 20).

MONTANA mark in the United States since at least 1990.

Even if United did not become aware of Haggar's registration until later, it is undisputed that in February 1991, Haggar's attorney filed Haggar's trademark registration for the MONTANA mark with U.S. Customs officials. (Defs.' 2009 56.1 Stmnt ¶ 43; Pl.'s 2009 56.1 Stmnt ¶ 43). It is also undisputed that in the summer of 1995,[47] one or two containers of United's MONTANA goods, which United had shipped to Nile Imports in the United States, were seized by Customs, pursuant to Haggar's registration, before the containers could enter the United States.[48] (Defs.' 2009 56.1 Stmnt ¶ 46; Pl.'s 2009 56.1 Stmnt ¶ 46; Tr. at 139, 142-43; Pl.'s Ex. 35). Defendants admit that "[i]n 1995, Nile's President Nubar Terzibachian informed United, at a meeting in Egypt, that Haggar had obtained a U.S. Trademark Registration for the mark MONTANA. . ." (Defs.' 2009 56.1 Stmnt ¶ 46), and that this registration caused the containers to be seized. Indeed, Maamoun testified that United stopped shipping MONTANA-branded goods to the United States through Nile because Mr. Terzibachian informed United that "two containers were rejected because Haggar registered the mark MONTANA five years ago and our right of objection has expired." (Tr. at 351).

In response to this news, Maamoun stated that he consulted with the Egyptian embassy in the United States (id. at 352-53), and it was his understanding that United could no longer object

_____

[47]The parties dispute whether the seizure happened in June of 1995 (see Pl.'s 2009 56.1 Stmnt ¶ 46) or August of 1995. (See Defs.' 2009 56.1 Stmnt ¶ 46).

[48]According to Ms. Boulos, this matter was settled when Nile's principal, Mr. Nubar Terzibachian, paid Mr. Boulos $30,000 to allow the containers to pass through Customs and agreed "not to buy anything else" from United and "would not ask any frozen vegetables from Egypt bearing the MONTANA brand." (Tr. at 144-45). Ms. Boulos further explained that "this was the last MONTANA brand container Nile ever took from United" and that after Haggar's settlement with Nile, United continued to export products to the United States but used different brand names, specifically Laziza and Dahlia. (Id. at 145-46).

59

to Haggar's registration of the mark. (Id. at 352). Thus, according to Maamoun, United decided

that it "[w]ould not send MONTANA [to the United States] at all" (id.); United did not try to sell

its MONTANA-branded products in the United States from 1995 to 2002 because "we did not

want to enter into problems." (Id. at 359). When asked if United wanted to sell its MONTANA-

branded products in the United States during this time period, Maamoun answered, "No, that

was it. We stopped because we were aware of the fact that we were not. . .permitted. . . ." (Id. at

360; see also id. at 363, 366-67). Therefore, it is undisputed that United knew by 1995 at the

very latest that Haggar was using the MONTANA mark in the United States.

    Moreover, it is undisputed that in 1990,[49] 1992,[50] and 2001-2002,[51] United initiated police

and legal actions against Boulos/Haggar in Egypt to assert United's rights to the mark (Defs.'

---

[49]Boulos admitted that Haggar experienced problems with Egyptian export authorities for a short period in 1990. (Defs.' Ex. HC at 228-31, 269). He explained that "United Company called the police forces in Egypt" to complain about Haggar's factory, which was producing MONTANA-branded goods for export to the United States. (Id.) Consequently, for the next six months to a year, Haggar changed the product's "name from MONTANA to Fontana so we could get the goods out of Egypt. . . ." (Id. at 230, 268).

[50]In 1992, United filed a police report and "attached the cold storage, a public cold storage that we used to store in." (Defs.' Ex. HC at 237). Boulos did not remember the incident other than to identify it as "the second case against us, again to try to prevent us from exporting our own private label [MISRCO] to the States using the same method that they always used, contact, police, and all that stuff." (Id. at 239).

[51]Maamoun testified that in 2001-2002, United understood that its time for objecting to Haggar's trademark registration in the United States had passed. (Tr. at 356). Accordingly, United investigated the source of Haggar's MONTANA-branded frozen food products and discovered that they came from a factory in Egypt. (Id.) United filed a complaint with the Egyptian special police, who raided the plant and confiscated some of Haggar's bags. The Egyptian court determined that Haggar and Boulos were misusing United's MONTANA trademark (Defs.' 2009 56.1 Stmnt ¶ 49; Pl.'s 2009 56.1 Stmnt ¶ 49), and sentenced Mr. Boulos in absentia "to six months." (Tr. at 358). Haggar appealed the decision, (Defs.' 2009 56.1 Stmnt ¶ 49; Pl.'s 2009 56.1 Stmnt ¶ 49), but Boulos died before the matter was fully resolved. (Id.) Although the appellate court upheld the decision as it related to Haggar, the court held that the judgment did not apply to Boulos because he had not been properly served. (Id.)

2009 56.1 Stmnt ¶ 49; Pl.'s 2009 56.1 Stmnt ¶ 49); yet it took no such action in the United States

until March 25, 2002, when it filed a petition with the USPTO to cancel Haggar's registration of

the MONTANA mark. (Pl.'s Ex. 66). In addition, United took no action in United States courts

until after Haggar filed this lawsuit on November 17, 2003; United only asserted its rights by

filing counterclaims on January 26, 2004.

   2. <u>Whether United Inexcusably Delayed in Acting to Enforce its Rights</u>

   In assessing the reasonableness of the period of delay, the Court must measure from the

time United knew or should have known of Haggar's allegedly infringing conduct to the date

United asserted its rights. <u>See</u> <u>Danjaq LLC v. Sony Corp.</u>, 263 F.3d 942, 952 (9th Cir. 2001).

The Second Circuit has held that in a dispute under the Lanham Act, a delay in excess of six

years raises a presumption of laches. <u>See</u> <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 191

(2d Cir. 1996) (basing the six year standard for presuming laches on the six year New York

statute of limitations for alleging fraud). Once the presumption arises, the burden shifts to

defendants to come forward with evidence to establish that the delay was excusable and that

Haggar suffered no prejudice from the delay. <u>Id.</u>

   Here, even construing the facts in a light most favorable to defendants, it is clear that

United waited more than six years to assert its rights[52] – from the seizure of the containers in

1995 until March 25, 2002, when it filed its petition with the USPTO to cancel Haggar's mark.

<u>Id.</u> Nevertheless, defendants argue that the Court should excuse this delay based on the advice

they received from both Mr. Terzibachian and the Egyptian Embassy in 1995 after United's

---

[52]In fact, if the time is measured from the earliest possible date that United could have taken action to forestall Haggar's registration of the mark, it would have been 14 years from the 1988 letter from Mund indicating Haggar's interest in registering the mark. Defendants do not deny receiving Mund's letter, and yet they took no action in response.

goods were seized by Customs; both allegedly advised United "that the time period to challenge Haggar's Registration, and its recordation with the U.S. Customs, had passed." (See Defs.' Brief at 59-60). Consequently, defendants argue that "United's delay was [reasonably] based on its belief that the only avenue for stopping Haggar from infringing on United's MONTANA mark was to take action against Haggar in Egypt. . . ." (Id. at 60).

In evaluating a laches claim, courts in this Circuit have employed a variety of different tests to balance the equities and determine if a claimant's delay was reasonable and excusable. In The Estate of Mantle v. Rothgeb, the court held that "[a] plaintiff's delay is excusable "[w]here plaintiff has not slept on her rights, but has been prevented from asserting them based, for example, on justified ignorance of the facts constituting a cause of action, personal disability, or because of ongoing settlement negotiations." No. 04 CV 4310, 2007 WL 4510326, at *5 (S.D.N.Y. Dec. 21, 2007) (citing Stone v. Williams, 873 F.2d 620, 625 (2d Cir.1989), vacated on other grounds, 891 F.2d 401 (2d Cir. 1989), cert. denied, 496 U.S. 937 (1990)). In Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc., the court held that "[i]n determining the reasonableness of [a claimaint's] delay, a court must weigh six factors: '(1) the strength and value of the mark; (2) plaintiff's diligence in the enforcement of his rights; (3) the harm to the plaintiff if relief is denied; (4) the good faith of the defendant; (5) the competitiveness of the parties; and (6) the harm to the defendant occasioned by the delay.'" 679 F. Supp. 2d at 283 (holding that claimant's delay was reasonable because plaintiff diligently asserted its right to the disputed mark as soon as it became aware of the significant change in defendants' usage of the mark) (quoting Saratoga Vichy Spring Co., Inc. v. Lehman, 491 F. Supp. 141, 154 (N.D.N.Y. 1979) (internal citation omitted), aff'd, 625 F.2d 1037 (2d Cir. 1980).

Finally, under the "doctrine of progressive encroachment," a claimaint's delay may be

found excusable because "a plaintiff is not obligated to file suit until the likelihood of confusion looms large and its rights to trademark protection have clearly ripened." Audi AG v. Shokan Coachworks, Inc., 592 F. Supp. 2d 246, 267 (N.D.N.Y. 2008) (internal citation omitted); see also Johnson & Johnson v. Actavis Grp. hf, No. 06 CV 8209, 2008 WL 228061, at *9 (S.D.N.Y. Jan. 25, 2008) (holding that "a plaintiff may delay in bringing suit until there is a likelihood of confusion due to the infringer's activities in the marketplace"). However, as the court in Audi AG v. Shokan Coachworks, Inc. recognized, it is also true that a plaintiff cannot simply sleep on his rights and still gain protection from the doctrine of progressive encroachment." 92 F. Supp. 2d at 267.

Here, United's delay was not reasonable under any of these tests. First, United was not "prevented from asserting [its claim] based, for example, on justified ignorance of the facts constituting a cause of action, personal disability, or because of ongoing settlement negotiations." The Estate of Mantle v. Rothgeb, 2007 WL 4510326, at *5. United was not ignorant of the facts underlying its claim. It is undisputed that United knew by 1995 at the very latest that Haggar was using the MONTANA mark in the United States and claiming sole ownership of the rights to the mark. (Defs.' 2009 56.1 Stmnt ¶ 46; Pl.'s 2009 56.1 Stmnt ¶ 46). When asked why he did not consult a U.S. trademark lawyer or take any other steps to enforce its claim for approximately seven years, Maamoun stated, "I am an attorney. It's not possible for me to send and contradict the American law, violate American law." (Tr. at 429-30). While United may claim ignorance about its ability to assert a claim to the mark at this time, such ignorance is not "justified." See The Estate of Mantle v. Rothgeb, 2007 WL 4510326, at *5.

Under the six factor test articulated in Road Dawgs, defendants have presented scant evidence concerning the strength and value of the MONTANA mark, and there has been no

63

discussion of the competitiveness of the parties or the harm that defendants will suffer if relief is denied. 679 F. Supp. 2d at 283. Defendants rest their argument almost exclusively on the alleged bad faith of Haggar and on United's efforts to enforce its rights to the mark in Egypt through police and legal action. Not only has the Court rejected the argument that Haggar and Mr. Boulos acted in bad faith, but United's enforcement efforts in Egypt are irrelevant to its claims in the United States. "The principle of territoriality is fundamental to trademark law. A trademark has a separate legal existence under each country's laws, and trademark rights exist in each country solely according to that nation's laws." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 70 (2d Cir. 2008) (internal citation omitted). United's legal actions against Haggar and Mr. Boulos in Egypt are relevant only to the ownership and use rights to the mark in Egypt; Egyptian courts have no jurisdiction over use of the mark in the Untied States. See id. Indeed, although defendants argue that United's efforts in Egypt "put Haggar on notice that United did not intend to sleep on its rights" (Defs.' Brief at 58), this is only true with respect to United's rights in Egypt. United took no action asserting its rights in the United States until March 25, 2002, when it filed its Petition to Cancel Haggar's trademark registration.

Finally, the doctrine of progressive encroachment does not save United's claim here. There has been a "likelihood of confusion due to [Haggar's] activities in the [United States] marketplace," Johnson & Johnson v. Actavis Grp. hf, 2008 WL 228061, at *9, since Haggar began selling frozen vegetables in packaging marked with the MONTANA brand name but without any mention of United. At the very least, United's claim "clearly ripened," Audi AG v. Shokan Coachworks, Inc., 592 F. Supp. 2d at 267, in 1995 when Haggar enlisted Customs to stop United's MONTANA-branded containers from entering the United States. When asked what changed between his understanding in 1995 that he could not challenge Haggar's

trademark registration and 2002, when United filed its petition to cancel Haggar's registration, Maamoun testified that the decision was due to the success of his police complaint against Mr. Boulos' Egyptian MONTANA plant. (Tr. at 430). After he got a judgment from the Egyptian court guaranteeing that no MONTANA-branded merchandise would be going from that plant to America, he concluded that "there was nothing else to be done in Egypt" and therefore he attempted again to register his trademark in the United States. (Id. at 430-31).

Not only is this explanation unpersuasive, but the doctrine of "progressive encroachment" refers to changes in the use by the alleged infringer, not to changes in the understanding or knowledge of the claimant. See Audi AG v. Shokan Coachworks, Inc., 592 F. Supp. 2d at 267. Thus, the Court does not find any change in Haggar's use of the mark between 1995 and 2002 that qualifies as "progressive encroachment," justifying United's delay in attempting to enforce its rights.

Consequently, the Court does not find United's delay reasonable or excusable.

### 3. Whether Haggar Will Be Prejudiced If United Is Allowed to Assert Rights

The party raising the equitable defense of laches affirmatively establishes actual prejudice when it shows that the passage of time has made evidence unavailable or difficult to obtain. Robins Island Pres. Fund, Inc. v. Southold Dev. Corp., 959 F.2d 409, 424 (2d Cir.) (holding that "defendant may suffer prejudice. . .because the delay makes it difficult to garner evidence to vindicate his or her rights"), cert. denied, 506 U.S. 1001 (1992); see also Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 65 (2d Cir. 1983) (holding that "an inequity might result in a case where a claim is permitted to go forward where relevant evidence has been lost due to a petitioner's delay in bringing suit"); Dress for Success Worldwide v. Dress 4 Success, 589 F. Supp. 2d 351, 365 (S.D.N.Y. 2008) (stating that in the typical laches cases, prejudice is

shown by demonstrating that "certain witnesses and evidence are now unavailable"); The Estate of Mantle v. Rothgeb, 2007 WL 4510326, at *5.

Here, plaintiff argues that "[i]n the many years since February 1991, when United affirmatively decided to abandon its trademark application after being informed of Haggar's MONTANA registration. . .witnesses, including Haggar's own founder and principal, have died, law firms have disbanded and/or cannot locate previously available files, and memories cannot be presumed to be as reliable when recalling events which took place a decade or more ago. . . ." (Pl.'s Brief at 52). In addition, plaintiff contends that if United had acted in a timely fashion, "Haggar could have either vindicated its rights using fresh knowledge and a full collection of current documents; or could have proceeded to grow its business using a trademark other than MONTANA. Either way. . .to now require Haggar to discontinue use of MONTANA as United seeks would be economically prejudicial." (Id. (citing Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 825-826 (2d Cir. 1943)).

Defendants argue that "Haggar did not and cannot show evidentiary prejudice because all of the key witnesses were either deposed at length, or present at the trial" and because "nearly all of the records relating to the business relationship between United and Haggar, the key issue in this case, are still available and many were admitted at the trial." (Defs.' Brief at 58). Moreover, defendants contend that "Haggar cannot show financial prejudice, because it did not present any evidence of its financial reliance on the delay, its costs of promoting its MONTANA products, or any other financial burden brought on by this litigation."[53] (Id. at 59).

---

[53]Defendants acknowledge that the trial was bifurcated on financial issues but state that this was not discussed until the preparation of the PJPO. Defendants suggest that because "there were no limitations to the scope of discovery during the discovery period," Haggar is wrong to assert that "[n]o discovery has yet been conducted on financial issues." (Defs.' Brief at n.25).

First, the Court finds defendants' economic argument unpersuasive. It is unquestionable that Haggar, which has been using the MONTANA brand in the United States since 1986, would suffer negative economic consequences if forced to discontinue its use of the mark now. Indeed, in their response to the Rule 56.1 Statement submitted by plaintiff in conjunction with its summary judgment motion on the issue of laches, defendants did not challenge plaintiff's statement that "Haggar continued to import, sell and expand its business under the MONTANA mark exclusively in the United States for the past ten or more years" and thus Haggar would "be economically prejudiced by the waste of the economic resources it has expended in the interim if it were now forced to discontinue use of the trademark MONTANA, and if its United States trademark registration for the word mark MONTANA were now cancelled." (See Pl.'s 2006 56.1 Stmnt ¶ 47; Defs.' 2007 56.1 Stmnt ¶ 47). Although no evidence has been presented on the precise amount of this damage, the Court does not need a precise accounting in order to find that Haggar would suffer economic prejudice if United was now allowed to claim sole rights to the MONTANA mark in the United States.

Moreover, defendants are incorrect that "all of the key witnesses" either testified at trial or were deposed. Magdi Maamoun, United's president and the only representative of United present for the initial meeting with Boulos and al Masri, died in 2007 (Tr. at 231) without having been deposed. Furthermore, the Court notes that while Mr. Boulos and Mr. al Masri's depositions were available for the Court's consideration, their deaths prior to trial deprived the Court of the ability to assess their demeanor – and thus their credibility – while testifying.

Finally, as an example of the deleterious effects of time on the memories of witnesses,

---

The parties may address this issue at the status conference to be held before the undersigned.

the Court notes how little Leonard Cohen, Esq., remembered about his and his firm's involvement with the parties in this case. Mr. Cohen was deposed on July 10, 2006 concerning his representation of Mr. Terzibachian and Nile Foods, specifically regarding the 1995 Customs seizure, and his former colleague Timothy Tyson, Esq.'s alleged representation of United, specifically concerning its alleged 1990 trademark application to the USPTO. (Defs.' Ex. HG). Indeed, Mr. Cohen was unable to remember even the identity of his client, recalling "Mr. Terzibachian and Nile Foods," and the fact that "there were complication about. . .who was who, and I don't recall what those complications were." (Id. at 33). He also did not remember whether Mr. Tyson filed a trademark application on behalf of United in 1990 (id. at 30; see also Pl.'s Ex. 67), a point Maamoun contested. (Tr. at 354-55, 425). Further, as noted above, plaintiff claims that Mr. Tyson has no recollection of the circumstances surrounding this case. (See discussion supra n.46).

Consequently, the Court finds that plaintiff would suffer prejudice if United was allowed now to assert a challenge to the MONTANA mark.

### 4. Whether Haggar Operated in Good Faith in Using the Mark

Finally, as discussed supra, the Court finds that Haggar operated in good faith in using the MONTANA mark in the United States and registering the mark in its name with the USPTO. Consequently, the Court finds that Haggar has successfully shown each of the four elements necessary to prevail on its equitable defense of laches. See Fusco Grp., Inc. v. Loss Consultants Int'l Inc., 462 F. Supp. 2d at 329 (citing McDonald's Corp. v. Druck & Gerner, P.C., 814 F. Supp. at 1136 and Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. at 1356). Given that approximately 12 years passed between the date Haggar registered the mark in the United States and the date United challenged the registration, the Court finds in favor of

Haggar on each of defendants' counterclaims. See Lincoln Logs, Ltd. v. Lincoln Pre-Cut Log Homes, 971 F.2d 732, 734, 23 U.S.P.Q. 1701, 1703 (Fed. Cir. 1992) (stating that "a laches or estoppel defense in an opposition (or cancellation) proceeding may be based upon the Opposer's failure to object to an Applicant's registration of *substantially the same mark*") (emphasis in original).

B. Acquiescence

Haggar also asserts the equitable defense of acquiescence to defendants' counterclaims. See Carl Zeiss Stifting v. VEB Carl Zeiss Jena, 433 F.2d 686, 703 (2d Cir. 1970), cert. denied, 403 U.S. 905 (1971). The difference between laches and acquiescence is that "acquiescence implies active consent, while laches implies a merely passive consent." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 462 (4th Cir.), cert. denied, 519 U.S. 976 (1996). Defendants contend that plaintiff is barred from asserting the acquiescence defense because they allege that plaintiff comes to the court with "unclean hands." (Defs.' Brief at 60-61). As it did in the laches context above, the Court rejects this argument and holds that Haggar is entitled to assert that United consented to Haggar's use of the MONTANA mark in the United States. However, since the Court has already concluded that defendants' counterclaims are barred by laches, there is no need to address Haggar's defense of acquiescence further.

## CONCLUSION

For the reasons stated above, the Court finds in favor of plaintiff on all of its federal trademark claims and finds against defendant on all of their federal trademark counterclaims. The Court hereby Orders the cancellation of United's MONTANA word mark, Trademark Registration No. 2,724,085, and an accounting of monetary damages owed to Haggar by defendants. The parties are also Ordered to appear for a status conference before the undersigned on **January 4, 2013 at 2:00 p.m.**

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**
Dated: Brooklyn, New York
        November 28, 2012

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York